## Richmond.

### RINGGOLD *v.* RINGGOLD.

November 18, 1920.

1. DIVORCE—*Cruelty—Case at Bar.*—A husband without justification refused to permit his wife to occupy his room and bed, and his conduct amounted to a general withdrawal from matrimonial cohabitation. He stated to her and others that he would not take her back until she had, in some vague and undefined way, and after some indeterminate period of five or ten years, met the requirements of what he imagined was a righteous judgment, for an act of vulgarity with a younger brother when a child. The husband encouraged gross mistreatment of the wife by his mother and sisters. There was no violence on the part of the husband, but the case did not lack the element of danger to the wife's health.

   *Held:* That the wife was entitled to a divorce *a mensa* on the ground of cruelty.

2. DIVORCE—*Cruelty—Divorce a Vinculo.*—Cruelty alone is not a ground for a divorce *a vinculo.*

3. DIVORCE — *Cruelty — Violence.* — Violence and apprehension of bodily hurt, though nearly always appearing in suits for divorce on the ground of cruelty, are not indispensable ingredients of that offense. Mental anguish, repeated and unrelenting neglect and humiliation, may be as bad as physical wounds and bruises, and may be visited upon an unoffending spouse in such degree as to amount to cruelty even in the very strict sense in which that term ought always to be used in the law of divorce.

4. DIVORCE—*What Constitutes Desertion—Case at Bar.*—Where a husband has withdrawn from the marriage bed, has declined to allow his wife to keep house for him, and has effectually deposed her as his wife, this constitutes desertion, although he did not decline to furnish his wife a living in his home, and continued for a time to pay her bills for clothing.

5. DIVORCE—*Desertion—Intent to Resume Marital Relationship.*—A husband cannot push his wife away from him, reject her appeal for a reconciliation and a restitution of her marital rights, tell her time and again and without reasonable excuse that she

cannot come back as his wife, and yet not be held to have deserted her merely because he says that he might take her back after an indefinite period of years, when she should, in some way not indicated ·by him, have lived out her life so as to expiate an act of her childhood which, while improper in itself, was committed before she had reached the age of discretion.

6. DIVORCE—*Desertion—Permanency.*—A desertion which is complete at the time, and gives no promise of a return within a reasonable time, certainly becomes permanent in the eyes of the law when the offending party refuses without cause to renew the marriage relation at the request in good faith of the other party.

7. DIVORCE—*Desertion—Abandonment Induced by Cruelty.*—Cruelty on the part of the husband which results in the wife's enforced separation from his bed and board is tantamount to desertion on his part.

8. DIVORCE—*Desertion—Divorce a Vinculo and a Mensa.*—The abandonment· and desertion which entitles a party to divorce from bed and board differs from that which is a cause for divorce from the bond of matrimony only in the respect that for a divorce of the latter kind the desertion must continue for three years. After the lapse of that period without any offer to return, the right of the deserted party to a divorce *a vinculo* becomes complete by operation of the statute.

Appeal from a decree of the Circuit Court of Rockingham county. Decree for defendant. Plaintiff appeals.

*Reversed.*

The opinion states the case.

*George N. Conrad,* for the appellant.

No appearance for the appellee.

KELLY, P., delivered the opinion of the court.

This is a suit for divorce, and for counsel fees and alimony, brought by Marjorie Ringgold against her husband, Herschel Ringgold, on the grounds of cruelty and desertion.

The decree appealed from denied the divorce, but required the defendant to "pay to complainant for her support the sum of twenty dollars a month until he is prepared and willing to provide her with suitable home with himself, separate in its housekeeping and family relations from that of his mother and sisters  *  *  *  and the costs of this suit, and the further sum of $150 to cover the fee of her counsel."

The case, in some important respects, is unlike any to be found in the books.  It is not free from difficulty in some of its strictly legal aspects, and there is room for debate as to whether the facts proved by the complainant make a case of cruelty or desertion in law.  But the evidence clearly shows that the complainant is a cultured, sweet-tempered young woman of integrity and chastity, and that her husband and his family were wholly and inexcusably to blame for the separation.  The defendant did not answer or offer any evidence in his own behalf, but there is not the slightest reason to suspect collusion between the parties. The learned judge of the circuit court was of opinion that her act in leaving her husband's home was not without excuse, and therefore awarded alimony and counsel fees as above set out; but, while applauding "her truly admirable conduct in the efforts she has made to overcome the extreme severity of her husband's judgment upon some indiscretion of her childhood, and to restore herself to her proper place in his affection and his home," was of opinion that "the evidence does not make out a case either of desertion or of cruelty, as the latter term is used in the law of divorce in this State."

Marjorie Ringgold was married to Herschel Ringgold early in April, 1918, and they began their married life at the home of the husband on a farm where his mother and five unmarried sisters also resided.  After the lapse of three or four weeks, the couple began a separate housekeep-

ing arrangement in the same house, occupying two rooms, one of which was a combined kitchen and dining room, and the other a bed room. About a month later, at the instance of the mother and sisters, this arrangement was abandoned, and the wife resumed a place at the family table.

The night before the marriage, in response to an inquiry from him as to any past relations or conduct on her part with other men, she informed him that on one occasion a young man had laid his hand on her lap and she had repulsed him. Later on, but just when does not appear, he renewed this inquisition, and, in a guileless and scrupulously frank and complete disclosure, she told him that several boys had put their arms around her, and that when a mere child (8 or 9 years old) she had slept with her brother, also a child, and had, ignorantly and innocently, indulged in some conduct (not sexual intercourse) with him which, after she reached womanhood and understood life, she realized was vulgar. Her standing and reputation before and after marriage are shown to have been the very best. They lived happily as man and wife for more than a month. Just why he should have made these inquiries, unless because of a prudish and suspicious disposition, is not easy to understand. At any rate, it must be especially noted that what he elicited from her at this rather remarkable confessional fell short of involving her chastity, and, further, that his subsequent mistreatment of her was based entirely upon the childhood incident mentioned above. The written opinion of the lower court, referring to the cause of the breach between the parties, says: "The unhappiness of this couple seems to be wholly due to the puritanical severity of her husband in relation to some act of indiscretion on the part of the complainant·committed before her marriage, and apparently when she was still a child, at least she says, to use her own words, that it was

before she 'reached womanhood or knew about life,' an attitude in which he is supported by his mother and sisters." This statement is fully supported by the record, and we have, therefore, only to consider whether this puritanical severity can be justified, and, if not, whether it was indulged in to such an extent and in such a manner as to amount in law to cruelty, or desertion, or both.

Ringgold seems to have brooded over what his wife told him about sleeping with her brother. Something like six weeks after the marriage, and for no other assigned reason than that incident, he became cold and indifferent towards her, and finally, in June, 1918, left her room and bed, and declined to live with her as man and wife. She was permitted to occupy a room in the house and to take her meals with the family, but under such circumstances of ostracism and disrespect as simply made her life in the home intolerable. About that time he became seriously ill. She was greatly concerned about him, and wanted to wait on and minister to him, but was not allowed to do so.

After he was up and at work, she on one occasion left the house and reported to him a certain wholly indefensible and offensive act on the part of one of his sisters, and got this reply: "You go back to the house, and if you can't live there with my people, why you can go away."

At another time he stated to her father that he held his mother and sisters in higher regard than his wife. His family circulated discreditable stories in the neighborhood about her, which he knew were unjust and untrue, but he declined to remonstrate with or restrain them.

These are but instances of a course of conduct towards her in which he persistently and relentlessly indulged, and in which he and his mother and sisters plainly conspired to humiliate her and make her life miserable. As stated in the opinion of the lower court, "the indignities and neglect that attended the daily life of this young wife were such as

to make her life in her mother-in-law's home intolerable to one of her refined sensibilities, and to make her excusable for leaving that home."

It seems that the defendant considered himself a very pious man. In the exercise of what he appears to have regarded as an exalted righteousness, he broke off matrimonial cohabitation with his wife, and, in the face of the most earnest and appealing efforts and overtures on her part, declined to give her any reasonable or definite reply to her inquiries as to how or what she should do to reinstate herself in his favor. All that he would say was that when she lived out of her life the sins of her childhood, he would take her back. That he had abandoned her as his wife and did not intend to again recognize her as such, except in the remote future and upon unreasonable conditions, is indisputably established by admissions made by him to friends of both parties who have given entirely disinterested and convincing testimony in the case.

The complainant had taught school before she was married. Late in the fall of 1918, she was solicited by the trustees and patrons to become the principal of a school in the neighborhood, about three miles from the Ringgold home. She was then, and had been for five or six months, living in a state of isolation and misery, forced to occupy a room separate from her husband, and to take her meals at the family table, where she was accorded the coldest and most intolerable treatment. She asked her husband: "Do you want me to take the school, or are you going to arrange things here so I can have something to do and keep house?" His reply was, "You do as you please about that," and said he would let her keep house "when everything was straightened up," which meant, in the light of the other evidence in the case, that when, in the course of a long period of years she had been sufficiently humiliated and punished to satisfy his whimsical and distorted ideas,

she might hope for a restoration of her place as a wife in his heart and home.

She accepted the school, and taught there until the end of the term in the following April, but for some time she returned to his home for each week end. During this time he did not voluntarily write to or communicate with her a single time, and when she suggested that she might telephone him from the school sometimes, he replied, "Don't call me unless you want something." While there, on February 27, 1919, she wrote asking him if he would not arrange for them to keep house together, "she didn't care where," and he replied as follows:

"Dear Marjorie: Be not deceived, God is not mocked. Whatsoever a man soweth, that shall he also reap. Gal. 6-7. May the Spirit of truth guide us into all truth that we may stand approved of God, and not of men. May God bless and keep you always.

                                    · "HERSCHEL."

The malediction, as well as the benediction, contained in the foregoing letter can be better understood and appraised in the light of what had quite recently preceded it. Ringgold and his wife were members of the Brethren church. At her instance, in January, 1919, there was an informal hearing of their differences before two ministers of the church. At that meeting he was cruelly unresponsive to all appeals from her and from others present. She, on the contrary, did more than could reasonably have been expected or required of her in an effort to reconcile him. She literally begged him on her knees to relent. She put her arms around him and told him she would do "anything in the world that is possible" to regain his favor, but he repulsed her embrace and pushed her from him. The facts were fully developed at that meeting and they were such as to satisfy the ministers that she was blameless. They

were his friends as well as hers.   They advised him to become reconciled, but he informed them that he did not ask or desire their counsel.   While on the stand as a witness in this case, one of these ministers was asked the following question and gave the following answer to what transpired at the meeting referred to:

"Q. Did he give any assurance to you gentlemen of his intention to treat her differently and improve his treatment towards her?

"A. No, sir, he did not.   He simply said that when she lives these acts of her child-life out of her life—he is to be the judge—then 'I will live with her as my wife, and take her as my wife.'"

He was then asked how long it would take her to comply with this condition, and he replied, "It may take five years and it may take ten years."

This church conference or investigation adjourned after midnight.   Mrs. Ringgold asked her husband if he wanted her to go home with him, and he said she "could do as she liked."   Hoping that the meeting and the advice he had received might have some effect on him, she went with him. When they arrived at his home she told him she could not see any reason why they should not live as husband and wife, and asked him to go to her room with her, but he said, "No, I won't go with you."

It was shortly after these occurrences that she wrote to him, and got from him in reply the letter above quoted; and she did not thereafter return to his home, but instead spent the week-ends at her father's home in Harrisonburg until the end of the school term, and since then has continued to reside with her father.

In March, 1919, a more formal conference of the officials of their church was held, called a church council, in accordance with the laws of that denomination, to make a second

investigation of the trouble between these parties.    The
husband's attitude remained unchanged, except in this im-
portant particular:    At the former meeting he had stated
that he did not question his wife's virtue and chastity, and
did not then charge that there had been sexual intercourse
between her and her brother; but at the church council he
denied having made those statements, and charged her with
unchastity, stating that by a comparison of certain dates
and events he knew that his wife was older than she
claimed to have been when she slept with her brother.
These latter statements of his are not only refuted by the
testimony of the ministers who heard what he said at the
first meeting, but by the testimony of his wife, and by that
of her father, who testified positively that she was eight or
nine years old at the time in question, and that she and
her brother were then sleeping together with the knowl-
edge and approval of their parents.    The husband's atti-
tude and his statements at the second hearing before the
officials of the church must, therefore, be regarded as an
unwarranted and groundless attack upon both the veracity
and the virtue of his wife.

Notwithstanding all that has been above detailed, and
more of like kind, this unhappy wife made further but
futile efforts to regain her husband's favor until and even
after this suit was brought.    One of these took the form of
a letter in which she offered to prepare and sign any state-
ment he might suggest.    He replied as follows on August
14, 1919:

"Dear Marjorie:    I have but this to say in regard to the
paper of which you speak in your letter of the 12th inst.
As at all times, I desire the truth as a free gift for the
truth's sake, and will be satisfied with nothing else.

"Sincerely,

"HERSHEL."

After receiving this letter, still endeavoring to satisfy his exactions, as far as she could understand them, she prepared and sent to him a statement in writing again detailing the facts as to her conduct with her brother. To this communication she got no reply, nor could she obtain one in response to efforts which her counsel made to that end at her request.

For a while after he refused to live with her as a husband, he paid her bills and furnished her money when she asked for it. But some time before this suit was brought she found that he was not paying the bills sent to him for things she had bought on his credit, and since then he has not been contributing to her support.

Replying to a question from her counsel, while she was testifying in the case, as to whether her health had been affected by the treatment received from her husband, she said: "I fell off in weight and I was in a very nervous condition and lost my appetite." Another witness, Mrs. Wine, who knew the parties well and was familiar with this controversy, made a similar statement as to the effect which the trouble between Ringgold and his wife had wrought upon her physical appearance.

We have no disposition whatever to recede from a fair and just application of the sound policy and salutary principles in pursuance of which the courts of this State have uniformly sought to maintain the strength and sanctity of the marriage vow. The hardship of a particular case cannot be allowed to break down or impair this policy and these principles, and our reports present more than one instance in which grievous hardship has necessarily resulted from the decision because a different decree would have imperiled the stability of the law of divorce, so long and well established in this jurisdiction. We appreciate the apparent difficulty which confronted the learned and upright judge of the lower court in dealing with the case in hand, and are

in full accord with his manifest purpose to go to any reasonable limit in discouraging the evils of divorce upon trivial grounds.

It will not do to forget, however, that justice in the individual case must always be a primary consideration in the decision of a controversy, and must be attained if consistent with a reasonable application of settled principles.

It is very generally held that where the marriage relation remains otherwise unimpaired, the mere cessation of marital intercourse in the sexual sense, though without justifying cause, does not amount to either cruelty or desertion within the meaning of the divorce laws. *Reynolds* v. *Reynolds,* 68 W. Va. 15, 69 S. E. 381, Ann. Cas. 1912A, 889; *Wills* v. *Wills,* 74 W. Va. 709, 82 S. E. 1092, L. R. A. 1915B, 770; 9 R. C. L., section 155, p. 368-9; 119 Am. St. Rep., note, p. 633; 138 Am. St. Rep., note, p. 163. The question does not appear to have been expressly decided in Virginia. In *Throckmorton* v. *Throckmorton,* 86 Va. 768, 777, 11 S. E. 289, 292, Judge Lewis, speaking for this court, said: "It seems not to be entirely clear whether a withdrawal of one of the parties from the matrimonial bed, without any withdrawal from general cohabitation, is or is not a legal desertion, but as the question does not properly arise in the present case, we express no opinion upon it." If our court has gone further than this, in either direction, in dealing with the legal effect of a mere withdrawal from the marriage bed, we have failed to find the case in which it has done so.

[1] But this is by no means the decisive question in the case at bar. Here we have not only an unjustified refusal on the part of the husband to permit the wife to occupy his room and bed, but a cruel and heartless course of conduct on his part which amounted to a general withdrawal from matrimonial cohabitation. He rejected her and turned his

back on her as his wife, and stated not only to her but to others who have given their evidence in this case, that he would never take her back as his wife until she had, in some vague and wholly undefined way, and after some indeterminate period of five or ten years, met the requirements of what he imagined was a holy and righteous judgment, but what in average common sense must be regarded as a despicable attitude of mind and heart. To this was added, with his approval and encouragement, gross mistreatment by his mother and sisters. Her status in the home was not that of a wife in any sense. She was a mere inmate, neglected and rejected by her husband, and scorned, defamed and humiliated by the other members of the household. And unlike most cases of matrimonial unhappiness, there is not in this case any ground upon which the wife can fairly or justly be charged with any share of blame. Upon the contrary, her conduct throughout has been exemplary, and it would be difficult to imagine a case in which an innocent and affectionate and deserving wife could have been more womanly and patient in her efforts to bring about a reconciliation, or could have had such efforts more cruelly rebuffed. The fact that she could have continued to receive her board and clothes in this miserable situation, and that there was held out to her the empty assurance that when, after she had been tortured for five or ten years, and had sacrificed in this way the best and richest part of her life, she might be recognized again as a wife, does not render the conduct of her husband any less the consummation of cruelty and desertion. The law of every case must in large measure be determined by its facts. We are of opinion that no violence will be done to the policy and principles of the divorce laws by giving this wife relief, and that, indeed, a different result would be inconsistent with the laws of a State which expressly allow divorces for desertion and cruelty. When the legislature

provides for divorces, it is not for the courts to say they shall not be granted. Their business is to see that they are either allowed or refused, in cases coming before them, in accordance with a cautious but reasonable and just interpretation and application of the statute.

[2] This is not a suit for absolute divorce. The alleged desertion has not continued for three years, and cruelty alone is not a ground for divorce *a vinculo*. The statute applicable to the case, Code 1904, section 2258, Code 1919, section 5104, provides that "a divorce from bed and board may be decreed for cruelty, reasonable apprehension of bodily hurt, abandonment or desertion."

[3] The husband has never offered any physical abuse or violence, and the wife has not claimed to have ever had any reason to apprehend bodily hurt. But violence and apprehension of bodily hurt, though nearly always appearing in suits for divorce on the ground of cruelty, are not indispensable ingredients of that offense. The authorities generally, including those in our own State, wisely allow for exceptional cases in which there may be extreme cruelty without the slightest violence. Mental anguish, repeated and unrelenting neglect and humiliation, may be as bad as physical wounds and bruises, and may be visted upon an unoffending spouse in such degree as to amount to cruelty even in the very strict sense in which that term ought always to be used in the law of divorce.

In *Latham* v. *Latham*, 30 Gratt. (71 Va.) 307, a landmark in the divorce laws of Virginia, the court held that the evidence was not sufficient to show either cruelty or desertion; but that learned jurist, Judge Staples, who delivered the opinion, was careful to say: "I agree there may be cases in which the husband, without violence, actual or threatened, may render the marriage state impossible to be endured. There may be angry words, coarse and abusive language, humiliating insults, annoyances in all

the forms that malice can suggest, which may as effectually endanger life, or health, as personal violence, and which, therefore, would afford grounds for relief by the court." See also *Reinhard* v. *Reinhard,* 96 Wis. 555, 71 N. W. 803, 65, Am. St. Rep. 66, and note p. 75; 9 R. C. L. p. 342, note 9.

This is a typical case for the application of this exception to the general rule. There was, to be sure, no violence, and, in the ordinary sense, no coarse words, glossed over as they were with scriptural quotations and pious admonitions, but at the core they were insulting and humiliating to the highest degree—charges of essential impurity so deep-dyed that it would probably take years for her to become pure enough to occupy the position of a wife, and to enjoy the respect and be worthy of the companionship of this man and his mother and sisters.

Nor does the case lack the element of danger to the wife's health, which, under the authorities, is necessary to constitute cruelty. She lost flesh and appetite, and was reduced to a condition of nervousness painful to herself and noticeable by others—a result which would be practically certain to follow with a refined and cultured woman who had loved her husband and had for more than a year been treated by him and his family as this record shows she had been.

We are clearly of opinion that the complainant is entitled to a divorce *a mensa* upon the ground of cruelty.

[4] As to the question of desertion, there would be no difficulty in the case except for the fact that the husband has indicated that after his wife had done sufficient penance he would be willing to reinstate her. The elements of a wilful and unjustifiable desertion, except the intention never to resume the relationship, abundantly appear. He has withdrawn from the marriage bed, has declined to allow her to keep house for him, and has effectually deposed her as his wife. It is true that he did not decline to furnish

her a living in the home, and continued for a time to pay her bills for clothing. But these things he might have done for a stranger, and she was, through his compulsion, no more than a stranger to him.

In *Magrath* v. *Magrath*, 103 Mass. 577, 4 Am. Rep. 579, it was held that where a husband, in addition to refusal of sexual intercourse, denies his wife his companionship and refuses to live with her, she is entitled to a divorce for desertion, although he has continued to contribute to her support. In that case the court said: "There is no more important right of the wife than that which secures to her in the marriage relation the companionship of the husband and the protection of his home. His wilful denial of this right, with the intentional and permanent abandonment of all matrimonial intercourse, against her consent, is desertion within the meaning of our statute. And such conduct is not relieved by the fact that he has from time to time contributed to her support and the support of her children."

In *Latham* ᐁ. *Latham, supra,* Judge Staples, quoting from the opinion of Judge Christian in *Bailey* v. *Bailey,* 21 Gratt. (62 Va.) 43, said: "Desertion is a breach of matrimonial duty, and is composed first, of the actual breaking off of the matrimonial cohabitation, and, secondly, an intent to desert in the mind of the offender. Both must combine to make the desertion complete. The intent to desert is usually the principal thing to be considered. Obviously a mere *separation by mutual consent* is not desertion in either. Nor, as a matter of proof, can desertion be inferred against either from the mere unaided fact that they do not live together, though protracted absence, with other circumstances, may establish the original intent. The courts have not laid down any particular rules of evidence for determining whether a separation does or does not, as matter of proof, amount to desertion; and the

question does not admit of such rules, but each case must rest on its own circumstances."

[5, 6]    This generally accepted definition of desertion, with the general rules by which it is to be tested and applied, is usually and properly held to imply an intention on the part of one consort to abandon the other permanently.    But can the husband in this case be heard to say, or can we say on his behalf, for he does not answer or testify, that he has not deserted his wife in a way which the law must regard as a permanent abandonment?    Can he literally push her away from him, reject her suppliant appeal for a reconciliation and a restitution of her marital rights, tell her time and again and without reasonable excuse that she cannot come back as his wife, and yet not be held to have deserted her merely because he says that he may take her back after an indefinite period of years, when she shall, in some way not indicated by him, have lived out of her life to the satisfaction of his misguided conscience, or judgment, if not his desire to see her suffer, an act of her childhood which, while improper in itself, was committed before she had reached the age of discretion or responsibility, and cannot, therefore, be regarded as sinful by the laws of either God or man?    We think not. A desertion which is complete at the time, and gives no promise of a return within a reasonable time, certainly becomes permanent in the eyes of the law when the offending party refuses without cause to renew the marriage relation at the request in good faith of the other party. *Tutwiler* v. *Tutwiler*, 118 Va. 724, 88 S. E. 86; 9 Am. & Eng. Ency. L., pp. 764, 773, 775; 9 R. C. L., p. 373, sec. 161; 119 Am. St. Rep., note, p. 623; 138 Am. St. Rep., note 154.

[7]    A kindred proposition, and one which is applicable to this case, was asserted in *Denny* v. *Denny*, 118 Va. 79, 86 S. E. 835, wherein it was held that such cruelty on

the part of the husband as resulted in the wife's enforced separation from his bed and board was tantamount to desertion on his part. The acts of cruelty in that case were different from those here involved, but the principle is the same.

[8] The abandonment and desertion which entitled a party to divorce from bed and board differs from that which is a cause for divorce from the bond of matrimony only in the respect that for a divorce of the latter kind the desertion must continue for three years. *Bailey* v. *Bailey, supra.* After the lapse of that period without any offer to return the right of the deserted party to a divorce *a vinculo* becomes complete by operation of the statute. *Harris* v. *Harris,* 31 Gratt. (72 Va.) 13, 31.

The sum allowed as alimony by the lower court appears to us as reasonable, and the appellant is not making any complaint here in that respect. The decree appealed from will be reversed, and this court will enter a decree granting the appellant a divorce from bed and board, and a recovery against her husband for the sum of $250 (being $100 in excess of the amount allowed by the lower court to cover services on this appeal) as the fees of her counsel, and the sum of twenty dollars a month, payable the last day of each month, from the date fixed for such allowance in the decree below until the further order of the circuit court; and the cause will be stricken from the docket of that court with leave to either party to have the same reinstated at any time in the future for any proper purpose.

*Reversed.*