# Richmond

SALLIE C. BABCOCK V. J. O. BABCOCK.

February 20, 1939.

Record No. 2009.

Present, All the Justices.

The opinion states the case.

*George F. Abbitt, Jr.,* and *George B. White,* for the appellant.

*Joel W. Flood* and *B. B. Campbell,* for the appellee.

BROWNING, J., delivered the opinion of the court.

The parties to this suit will be referred to as individuals. The Reverend J. O. Babcock is a retired minister of the Methodist Episcopal Church, South, and when he married Sallie C. Babcock he was a widower. Sallie C. Babcock was Mrs. Sallie C. Cheatham, a divorced woman, when she married Mr. Babcock. They were married in Richmond, Virginia, on May 1, 1937, and became residents of Appomattox, Virginia, where Mr. Babcock had recently built a residence. They separated on July 22, 1937. Mrs. Babcock returned to her former home in Richmond and Mr. Babcock leased his residence in Appomattox and made his abode at

the home of his sister-in-law, Mrs. Rosa B. Babcock. On August 18, 1937, Mr. Babcock instituted suit against his wife for a divorce *a mensa et thoro*.

Thus the second matrimonial venture of each of these persons came to an abrupt end, and its pathetic details are before us.

The case was heard upon the bill filed by Mr. Babcock, with exhibits, the answer of Mrs. Babcock and Mr. Babcock's replication thereto, her cross-bill and the answer thereto of Mr. Babcock, and the depositions of witnesses and the exhibits filed therewith. Both of the bills charged desertion upon the part of each of the defendants and both prayed for the appropriate relief.

The trial court entered a decree dismissing the cross-bill of Mrs. Babcock and granting Mr. Babcock a divorce *a mensa* from Mrs. Babcock. The decree was silent as to the costs of the suit. Mrs. Babcock's claim for alimony was, of course, disposed of by the dismissal of her cross-bill.

When Mr. and Mrs. Babcock were married he was seventy years old and she was forty-five. His first wife had been dead for several years. He had retired from the active ministry and had just finished building a new home in the town of Appomattox.

Mrs. Ferguson and her daughters and a son, who were prominent residents of the town, were his friends and he enlisted the kindly offices of the ladies of this family to help him find a wife. He besought one of the ladies to bring about a meeting between himself and Mrs. Babcock, who was then Mrs. Cheatham, of whom he knew nothing, but of whom Mrs. Wagers (nee Ferguson) had spoken in the most gracious terms. Mrs. Wagers, who lived in Richmond when she was first married, lived in the same house with Mrs. Cheatham and knew her well. The meeting between them was effected by Mrs. Cheatham being invited to visit the Fergusons. Mr. Babcock made a proposition of marriage at once, which was followed by a series of letters of the most affectionate nature.

Mr. Babcock, though a minister, had succeeded in saving a sum from which he derived an income of from $800.00 to $1,100.00. His means consisted of his home in Appomattox, which cost about $3,500.00; a trust fund which he established at the First and Merchants National Bank of Richmond for the benefit of his first wife and their afflicted son; some small investments in bonds, etc., and three insurance policies of $1,000.00 each; and a pension from the church for its superannuated and retired ministers. In the course of his courtship he promised to give Mrs. Cheatham everything to make her happy, enumerating a number of specific things which he thought would contribute to that end, including the new house. In one of his letters he assured her that he had already made her the beneficiary of a trust fund, which would take ample care of her if he should die first and that this would be effective upon the date of their marriage.

When they were married he purchased furniture and installed in his house the modern conveniences. He bought an automobile and had it registered in his wife's name. Their marriage lasted eighty-two days, in which period he paid his wife $181.00. Their wedded life, which appeared to begin auspiciously, soon went upon the rocks. A few days after they were married she asked for a night-latch key. She wanted to visit their friends and go out in the evenings. He preferred to stay at home and he wanted her to do the same. He charged that she did not want him to accompany her, that she tired of his companionship and that she said ugly things about it. She alleged that she asked him to pay calls and make visits with her but he preferred to stay at home and read the newspapers. As to these charges, we think the evidence preponderates in her favor. Mrs. Ferguson and her three married daughters gave convincing testimony corroborating Mrs. Babcock.

On July 16, 1937, both Mrs. Babcock and her daughter, Miss Dorothy Cheatham, who was visiting her mother and step-father, testified that he ordered both of them to leave his house. A conversation between the mother and daugh-

ter about a trivial domestic matter caused this unhappy incident. This is denied by Mr. Babcock but we think the evidence tends to support the testimony of his wife and her daughter.

On July 22, 1937, according to their testimony, he again ordered his wife and her daughter to leave his house. This was occasioned by the unwanted presence of the daughter as a guest. They both testified that when they assured him that they would go that he replied that it would be the happiest moment of his life. They left, going to the home of Mrs. Ferguson and spending the night. They returned the next day to get their belongings. Mrs. Babcock had supplied some of the bed room furniture from her home in Richmond and Miss Cheatham had a Chesterfield, upon the purchase price of which she was still making partial payments. Mrs. Babcock was having her furniture moved to Mrs. Guill's where it was being stored. Several persons were engaged to do this, a high school boy seventeen years old, another boy of sixteen and a man named Anthony Hancock. Mrs. Babcock and her daughter testified that Mr. Babcock became enraged and called them both thieves. Their testimony was corroborated by that of the three persons just mentioned. The high school student, who is a son of the deputy sheriff, stated that Mr. Babcock's language was so rough and insulting that it scared him and he left the house. Mr. Babcock vigorously denied this. The evidence, however, is strongly against him.

It is urged that Mrs. Babcock is avaricious; that she married Mr. Babcock for his money. His counsel asked Mrs. Babcock on cross examination if she did not tell Mr. Bishop on one or more occasions that she only married Mr. Babcock for his money. Mrs. Babcock denied this. Mr. Bishop was not called as a witness to affirm it. Mr. Bishop was the Methodist minister in charge of the church in Appomattox.

It is of damaging import to Mr. Babcock's case that on July 27, 1937, he leased his home and a part of the consideration for the lease was that the lessee, an attorney,

would represent him in any litigation between himself and his wife; that on July 22, 1937, the very day on which he ordered his wife and his daughter to leave, there appeared in the Times-Virginian, a newspaper published in Appomattox, the following notice:

"Notice: I will not be responsible for any debts other than those I personally make.

"J. O. BABCOCK."

On July 9, 1937, Mr. Babcock wrote his wife an ardent love letter, employing the most endearing terms and thanking her for her good management as his housekeeper.

On August 12, 1937, he addressed a letter to Mrs. Babcock, which he urges was a *bona fide* effort to conciliate his wife and induce her to return to him. This letter fails, in our opinion, to bear this significance. It is entirely out of accord with the other incidents which we have detailed.

Mrs. Babcock repeatedly, by letters and by her testimony, signified not only her willingness, but her desire, to return to him as his wife. This he ignored.

He urges that Mrs. Babcock was not frank with him in that she did not tell him at once that she had been divorced. She denies this. The documentary evidence shows that she informed him of it before they were married. In his brief it is said in this connection that, "She explains this deception by saying, 'I did not say whether I was a grass or sod widow.'" We do not find this expression in the evidence. It is, of course, a mistake.

In our opinion the evidence shows quite conclusively that Mrs. Babcock was forced by Mr. Babcock to leave his home; that she had no alternative. Neither of them is without fault. She was much less so. The wreck of their wedded life was doubtless due partially to the disparity in age and more to Mr. Babcock's realization of the expense incident to housekeeping, and the consequent whittling away of his savings. It is worthy of remark that on the day of Mrs. Babcock's·departure she cooked and served his breakfast and lunch. This she had been doing all along.

The learned chancellor submitted an opinion which is inserted in full in Mr. Babcock's brief. It is a clear and forceful summation of the case as he saw it. We are, however, not in agreement with him in his conclusions. Our reports abound with cases which are pertinent here. Among them are *Martin* v. *Martin,* 166 Va. 109, 184 S. E. 220; *Markley* v. *Markley,* 145 Va. 596, 134 S. E. 536; *Inman* v. *Inman,* 158 Va. 597, 164 S. E. 383; *Gentry* v. *Gentry,* 161 Va. 786, 172 S. E. 157, 159. In the last mentioned case this court said:

"It next becomes important to determine whether or not Mrs. Gentry is entitled to a divorce from Mr. Gentry under the allegations of her cross-bill. As we have seen, Mrs. Gentry made repeated efforts to become reconciled with her husband, but without success. Inasmuch as the husband was not justified in severing the marriage relations, he was not justified in refusing to permit her to return to him as his wife. This sustains her charges of desertion against him and entitles her to a divorce."

We think that the evidence sustains the charge by Mrs. Babcock of desertion on the part of her husband and that she is entitled to a divorce *a mensa et thoro.* Inasmuch as she prays for an allowance of alimony we submit these observations upon that issue. Her husband, for one of his means, was liberal in his expenditures for their joint comfort. A considerable portion of this, however, is still a part of his home in the form of fixtures and furniture. He gave her a new automobile and some money. He is now beyond seventy and not in robust health, and she is a comparatively young woman and more capable of earning a livelihood than he. Besides, he has an afflicted son whose care, to a certain extent, must be met by income from the trust fund which Mr. Babcock has established, in part, for that purpose.

In the case of *Barnard* v. *Barnard,* 132 Va. 155, 111 S. E. 227, it is said in the syllabus: "In fixing alimony it must be borne in mind that under modern conditions there is open to the wife practically every avenue for making money that is open to her husband; and that by the decree

of the court she is released from her household duties, and she has no right to remain idle at the expense of her former husband, although it was through his fault that she was compelled to ask that the contract of marriage be rescinded."

The decree of the trial court will be reversed and a decree here entered granting Mrs. Babcock a divorce, *a mensa et thoro,* from her husband and awarding her the court costs incident to this appeal, to be paid by Mr. Babcock, but denying her prayer for alimony.

The relief prayed for by Mr. Babcock is refused.

*Reversed.*