JEAN S. MILES

*v.*

BILLY C. MILES

(No. 10002)

Submitted April 6, 1948. Decided June 8, 1948.

KENNA, JUDGE, dissenting.

*Kingdon & Kingdon,* for appellant.

*H. W. Dushkoff* and *Ray Toler,* for appellee.

RILEY, PRESIDENT:

The plaintiff, Jean S. Miles, brought this suit in the Circuit Court of Wyoming County, praying for an absolute divorce from her husband, Billy C. Miles, the custody of their infant daughter, Billy Jean Miles, alimony, court

costs, and attorney's fees. From a decree awarding plaintiff a divorce, the care and custody of the child, alimony in the sum of fifty dollars a month, twenty-five dollars a month for the maintenance and support of the infant child, and attorney's fees, defendant prosecutes this appeal.

In her bill of complaint, plaintiff charges defendant with cruel and inhuman treatment, under Code, 48-2-4, and the latter, in his answer, first denied that he was guilty of cruel treatment and by way of confession and avoidance set forth the defense of condonation.

The record discloses that the parties were married in Bluefield on August 18, 1945, without the knowledge or consent of plaintiff's parents, and that they separated on September 28, 1946. At the time of the marriage plaintiff was twenty years old and had not been previously married. Defendant had been married on three former occasions, which marriages had been dissolved by divorces.

Plaintiff testified that when she was eight months pregnant, defendant hit her a hard blow on the head with his fist; that on another occasion he jerked her out of bed and shook, slapped and kicked her; that on the day of the separation defendant beat and choked her, while she was bathing their baby; and that as the result of one of his beatings there were bruises on her back, breast and head; and on other occasions the beatings resulted in scars and bruises which could be seen and were testified to by other witnesses. While the parties were living together at Oceana in Wyoming County, Mr. and Mrs. J. L. Selvey found plaintiff at a neighbor's house crying, on which occasion plaintiff exhibited to them bruises which she testified were the result of defendant's beating and choking her. Mrs. Selvey testified that defendant had admitted to her he had hit plaintiff. Other witnesses, one Chester Hawkins and a Mrs. James Roberts also stated that they saw finger prints and marks on plaintiff, which plaintiff said were caused by defendant's abuse.

We glean from this record that both parties were persons of high temper, and that while they lived together

the relations between them were far from amicable. Defendant accused plaintiff of being unwilling to conduct a proper home for him by failing to cook regular meals for him for two months prior to the separation. But, on the other hand, plaintiff says that defendant did not get up in time for breakfast; that of his own volition he took his meals at the place where he worked; and that when defendant went to bed she fixed sandwiches so he could eat them while he read in bed.

These alleged acts of cruelty were categorically denied by defendant, but the trial chancellor found, as shown by his written opinion made a part of the record, that his denial was not convincing.

In addition to his denials, defendant contends that plaintiff, as shown by her own testimony, condoned the acts of cruelty charged. According to plaintiff, she had had sexual intercourse with defendant at her parents' home in Mullens on two occasions after the separation. These occurred two days apart in evenings when her parents were away from home. She testified that when defendant came to see her he "kept bothering me and asking for relationship", and that she refused until he "overcome my emotions". On the second and last occasion she says defendant telephoned her to see if he could come to the house, and, after obtaining her Aunt Mary's approval, she telephoned him to come. On this occasion she testified that she tried to get defendant to wait but he would not and "I will say I voluntarily gave into it because I couldn't help it". This witness further testified that defendant told her that since they were husband and wife, it would be all right to have sexual intercourse and that it would not prevent or interfere with her getting a divorce. On November 11, 1946, plaintiff wrote to defendant, in part, as follows:

"Seriously—I am coming home. I'm afraid it will have to wait til first of next week though. I am hoping you still want us to come home. You can write and tell me what you want.

\* \* \*

"Dad and I had a long talk last week and he said that if he thought you would be good to me and we could make a go of it then he'd like to see us go back together.

"But I'm afraid that *mon* won't get over it for a long time. I have already forgiven you but she hasn't. She doesn't want me to come back because she is afraid the same thing would happen again but I know it won't. Bill—I have lots of faith in you and I know you will keep your word.

\* \* \*

"Billie Jean sends her love:

"Love, ·
Jean."

The plaintiff did not go back to defendant after the letter was written, and nothing occurred after the alleged acts of condonation, which would amount to a waiver of condonation, if such there was. In fact, the parties were not together again until they were brought together during the course of the trial, so there was no opportunity for any act of cruelty to intervene between the alleged condonation and the bringing of this suit.

In our opinion, the trial chancellor was justified in his finding that defendant was guilty of statutory cruel and inhuman treatment, so that, in the absence of condonation, plaintiff would be entitled to a divorce. In *Duesenberry* v. *Duesenberry*, 82 W. Va. 135, 95 S. E. 665, this Court, in a suit for divorce *a mensa et thoro* on the ground of cruel and inhuman treatment, held that where the trial court has found from the evidence the fact of cruel and inhuman treatment such as would merit relief, "and the evidence tending strongly to support that finding, the decree will not be reversed on the question of fact." Pt. 2, syl.

So the decisive question in this case is whether the acts of intercourse engaged in by the parties after the separation considered in connection with plaintiff's letter of November 11, 1946, are sufficient to constitute condonation. Unlike a case in which a divorce is sought on the ground of adultery, where, under Code, 48-2-14, a single act of coition, after the innocent party has knowledge of

the adultery, is sufficient to constitute condonation, acts relied upon for condonation of statutory cruel and inhuman treatment must "evidence an unequivocal intent to forgive the transgressions complained of and to voluntarily resume marital relations." *Norman* v. *Norman,* 88 W. Va. 640, 107 S. E. 407. So it cannot be held that the two acts of sexual intercourse, which plaintiff finally admitted on cross-examination were entered into voluntarily on her part, are sufficient to condone the acts of cruelty on defendant's part established by this record. They, however, should be considered with the other evidence bearing on the defense of condonation for the purpose of determining whether this case comes within the ruling in the *Norman* case. We think it does. In *Currence* v. *Currence,* 123 W. Va. 599, Pt. 1, syl., 18 S. E. 2d 656, this Court held that "The continuance or resumption of full marital relations by a husband and wife subsequent to an offense by one of the spouses, which is a ground for divorce, operates as a condonation of such offense." But that was a case in which the requirements for condonation set forth in the *Norman* case more than met the correct rule as stated in the latter case, that is, there must be unequivocal *intent to forgive* and *to resume* marital relations. The actual resumption of marital relations not being a prerequisite to condonation, plaintiff's letter of November 11, 1946, being strongly conciliatory in terms, evidences an unequivocal intent on plaintiff's part to forgive defendant's cruel and inhuman treatment and to resume marital relations with defendant. The letter reads, in part: "Seriously—I am coming home * * *. I am hoping you still want us to come home. * * * I have already forgiven you, but she [plaintiff's mother] hasn't."; and concludes "Billy Jean sends her love. Love, Jean." It is hard to imagine how plaintiff could have worded her intent to forgive the alleged acts of cruelty on defendant's part and to return to defendant's home in stronger language. In this connection the acts of coition, of course, must be taken into consideration, though in the instant case they may not be given much weight, if it is true, as plaintiff says, that defendant told her that such acts

would not prevent her obtaining a divorce. Be that as it may, we are of opinion that defendant has fully established his defense of condonation, and that the trial chancellor's finding on this question, though entitled to great weight *(Maxwell* v. *Maxwell,* 75 W. Va. 521, 84 S. E. 251), is not supported by the evidence.

Therefore, the decree of the trial court is reversed in so far only as it awards plaintiff a divorce from defendant, and awards alimony to plaintiff. In all other particulars the decree is affirmed.

*Affirmed in part;*
*reversed in part.*

KENNA, JUDGE, dissenting:

The conclusion of the majority that the circumstances of this case amounted to condonation by the wife of the cruelty of the husband that would otherwise have entitled her to a divorce, to my mind, is a complete *non sequitur* of the very reasons advanced in the majority opinion as sustaining that conclusion.

Although this Court's first divorce case plainly holds to the contrary (see *Burk* v. *Burk,* 21 W. Va. 445), the opinion correctly follows the clear weight of authority to the effect that occasional intercourse following a known ground of divorce does not *per se,* save in case of adultery, amount to condonation, but states that it is to be decided whether that conduct, coupled with the letter that the opinion quotes from the wife to the husband, constitutes condonation. The opinion decides that it does.

In this jurisdiction condonation shown by circumstantial evidence, as distinguished from express condonation, after separation, is the complete resumption of marital relationship, coupled with knowledge of the acts to be condoned. It is sometimes spoken of as embracing two elements: forgiveness and resumption of the marital relationship, both being essential. However, since knowing resumption of the marital relationship necessarily carries forgiveness, it would seem that it may be reduced

to one essential, forgiveness being a necessary part of resumption.

But what is resumption of the marital relationship? If sexual intercourse is not conclusive of this question, it would seem to follow that there is no set standard by which it may be determined, but that it depends upon the circumstances of the case under consideration. Married couples live under diverse circumstances. What amounts to the marital relationship to a couple who are normally together on Sundays only, might be considered well-nigh desertion with others. It would seem, therefore, that the marital relationship should be that which is the normal conduct of the couple concerned, or the life that they pursued immediately prior to the occurrence being considered. In other words, if the married couple "picks up where it left off" its habits of life, the individuals involved have resumed their marital relationship. Of course, we are discussing circumstantial evidence of condonation, and not a declared purpose to condone. It is the intention of the persons concerned as disclosed by their actual conduct.

Here the couple had been living in a rented house in a town several miles from Mullens, where the wife resided with her parents when the occurrence upon which the contended condonation rests took place. It was from Mullens that Mrs. Miles wrote the letter which the majority regards as the determinative factor showing condonation. Remembering that in this jurisdiction condonation requires forgiveness and resumption of marital relations, in my opinion, the letter in question clearly shows on its face that at that time it was Mrs. Miles' intention to resume marital relations *only* by going back home at a later date: not to do so at that time nor at any time before leaving her parents and going home. The letter says:

> "Seriously—I am coming home. I'm afraid it will have to wait til first of next week though. I am hoping that you still want us to come home.
> * * *

* * *

"She doesn't want me to come back because she is afraid the same thing would happen again but I know it won't. * * *."

What could more clearly indicate that nothing short of "coming home" would be considered a resumption of marital relations? They never went home to the husband, but, on the contrary, this proceeding was instituted. True, after the letter they had intercourse, correctly stated by the majority to be insufficient to constitute a resumption, but those occurrences followed her declaration that she would do nothing that would prevent obtaining a divorce and his undenied assurance to her that since they were still married, it was their right and that it would not stand in the way of a complete divorce. He had been divorced three times: she was young and inexperienced. The influence of the husband over the wife in the matter of resuming cohabitation is recognized in the cases. *Glass* v. *Glass,* 175 Md. 693, 2 A. 2d 443; *Duncan* v. *Duncan,* 184 Ga. 602, 192 S. E. 215.

Believing that the letter, coupled with the assurance of the husband, not denied by him when on the stand, plainly shows that the couple had never resumed their marital relationship, and hence that his established cruelty was not condoned, I would affirm the decree.

The opinion of the majority seems to be based upon the belief that condonation as a defense in divorce cases has a tendency to reduce the number of divorces. That is not my view. If condonation is to become the likely result of unsuccessful efforts to become reconciled, it is certain that the person whose rights have been injured will be extremely apprehensive of the slightest gesture that might result in surrendering a legal right to relief. It will result in fewer, not more, reconciliations. If the courts, as here, are going to punish the person who initiates the effort to forgive and forget, when that effort is futile, there will be fewer, not more, efforts of that sort.

The statement in the majority opinion that the actual resumption of marital relations is not a prerequisite to condonation may be true when considered in connection

with express condonation. But when considered in connection with condonation shown by circumstantial evidence, as here, it is against a practical unanimity of the decided cases to the contrary. 17 Am. Jur. 254.

For the foregoing reasons I dissent.