# Richmond

THOMAS ANDERSON BAYTOP v. LILLIAN HOLMES BAYTOP.

October 14, 1957.

Record No. 4696.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Lewis Jones, Jr.,* for the appellant.

*A. Fleet Dillard,* for the appellee.

MILLER, J., delivered the opinion of the court.

■ On April 6, 1956, appellee, Lillian Holmes Baytop, instituted suit for divorce against appellant, Thomas Anderson Baytop. She charged cruelty, and constructive desertion as of April 1, 1956, and prayed for a divorce *a mensa et thoro*, and alimony. In his answer and cross-bill, appellant denied the charges, alleged that appellee had deserted him and prayed for a divorce because of her desertion.

The evidence was heard *ore tenus* on July 25 and 26, 1956. The court concluded that appellee's allegations had been sustained and that she was entitled to a divorce from bed and board and $150 a month alimony. From a decree of July 26, 1956, carrying these findings into effect and dismissing appellant's cross-bill, he appealed.

Appellant asserts that,

(a) Appellee's testimony was uncorroborated and insufficient to sustain the decree, and appellee condoned any cruelty on appellant's part;

(b) He should have been awarded a divorce on the ground of desertion; and

(c) No alimony should have been awarded appellee.

Much of the testimony is irrelevant, but that material to the issues may be stated thus:

Appellee, now 40 years of age, was born near Dunnsville, Virginia, where her parents lived until their deaths in 1955. Appellant, 41 years of age, was born at Water View, Virginia, where his parents now live. The parties first met in 1941 while attending St. Paul's Polytechnic Institute, Lawrenceville, Virginia. They both graduated from this institution and then did graduate work at Hampton Institute, Hampton, Virginia, and she also studied at Virginia State College, Petersburg, Virginia. Appellee accepted a position as a teacher in Middleburg, Virginia, and appellant secured a position as a teacher at Dover, Delaware. When they were married on April 23, 1949, both had been teaching for several years. She was still teaching at Middleburg, and he in Delaware, when they separated on April 1, 1956, and appellee was earning a salary of approximately $3100 a year and appellant about $4200 a year. He also owns some land in Middlesex county where he has a tractor which has been partially paid for and other farming implements.

When married both of them thought it best to continue teaching so they could accumulate funds with which to build a house. Ap-

pellee had a room in a private home in Middleburg where two or more other teachers were lodged. Appellant shared a small apartment in Dover, Delaware, with another man, but later he moved to an apartment in nearby Seaford, Delaware, which he still maintained on April 1, 1956.

Throughout the first several years of their married life, appellee visited appellant at his apartment on week-ends. About twice a month she would go to Delaware on Friday and stay until Sunday, and on a few occasions appellant went to Middleburg to visit his wife. At other times both visited their parents at Dunnsville and Water View, and were thus together for short periods of time. In the summer of 1953, they spent two or three months together at the home of appellant's sister in Middlesex county, yet at no time during their married life did they have a home together.

Relations between the two became strained in 1953 and 1954. Appellee said that appellant made it plain that he did not desire that she continue to visit him, refused to give her a key to his apartment and never met her at the bus station. He discouraged all suggestions that she be allowed to secure employment where he lived so that they could maintain an apartment together and finally told her, "We will never have anything together." As time went on, the relations became more strained, and during the summer of 1954, appellee found a letter written to appellant from another woman. It disclosed that illicit relations had existed between appellant and the writer, and that she was pregnant by him. His attempted explanation of this letter, and his associations with this woman clearly show that he had been unfaithful to his wife. Though appellee condoned her husband's offense and continued to visit him, yet she became more nervous and unstrung. Her testimony and that of members of her family show that she at times had spells of crying and prolonged nervous tension, lost weight, and had to seek medical aid for her condition. Their testimony also shows that appellant was rude to his wife and coldly indifferent to her condition and to her efforts to have him establish a home so that they might live together normally. Her sister, Clara Bayton, described her condition as follows:

"A. Well, I would say that as time goes on she seems to be more nervous and upset, just under a nervous strain all the time and so much so we would ask her, 'Are you feeling well?' She would say, 'Oh, yes, I feel all right,' and then she would break down and cry, but she wouldn't say why she was crying.

\* \* \* \* \* \* \*

"Q. You say that she had not always been nervous. When, if at all, did you observe any particular change in her in that regard?

"A. Well, I would say from the past three to four years she has been excessively nervous and as time went on more so.

\* \* \* \* \* \* \*

"Q. You say she has lost weight gradually since 1953?

"A. Yes."

Her brother, Raymond L. Holmes, in describing her condition, said that she was "quite nervous and upset \* \* \* would break down and cry at times, and not have much to say to anybody," but after April 1, 1956, there had been a noticeable change for the better and she was not "nearly so nervous as she was, maybe, six months ago."

On March 31, 1956, while they were on a week-end vacation with appellant's parents in Middlesex, appellant left about eleven a.m. About midnight appellee found him at a nearby "beer parlor." She insisted that he leave; each became incensed with the other, and they cursed and abused each other. She says that after he cursed her, she slapped him. He thereupon left in his car, and she thought he was going to his sister's but when she arrived in her car, he was not there. After staying there a short time, she drove on to his parents' home, and she gave this account of what then transpired:

"[W]hen I got to his mother's home he had gone in and gone to bed and he had locked the door, but he wouldn't get up to unlock the door, and I called him and his mother wouldn't get up until I called his name and she came down, and when I got in I said, 'Why didn't you open the door?' He said, 'I was asleep,' and then he said, 'You thought you were so goddam cute coming in that place to get me out, didn't you?' I said, 'No, but you are my husband and we haven't seen each other for two or three week ends and it looks like you could have come home and had your dinner after I prepared it,' and he said 'Don't you slap me any more. If you do I am going to get up and stomp your guts out,' and then he called me 'a goddam run-down gut.' Then I called him 'a black son-of-a-bitch' and then he said, 'I am not going to sleep in the bed with you if I am a goddam son-of-a-bitch,' and he got up and started to putting his clothes on and then his mother came down, and then he said everything he felt

like saying. I didn't say anything other than I started to packing.

"He said, 'You can get ready and go tonight if you want to. I will help you put your things in the car,' and I said, 'I don't need you to do that,' and that was around one o'clock and I carried some things out, and each time I carried something out he would open the door, but he wouldn't help me carry anything out, so then I decided to stay there that night and not leave."

Later that night she and her husband engaged in sexual relations, but she said that she acceded to his wish in that respect to pacify him.

The next morning, which was Easter Sunday, when she announced that she "had planned to go to church," he said, "Well, you won't have to come and look for me tonight." Upon returning from church, she told appellant, "I came for my things. I feel I have taken as much as I can take. * * * I am just leaving because I have taken all that I could take." She then finished her packing and left.

Though physical violence or reasonable apprehension of bodily harm are usually in evidence where cruelty is established as the grounds of divorce, yet there may be cruelty that justifies the award of a divorce where physical abuse or apprehension of bodily hurt is absent.

"* * * The authorities generally, including those in our own State, wisely allow for exceptional cases in which there may be extreme cruelty without the slightest violence. Mental anguish, repeated and unrelenting neglect and humiliation, may be as bad as physical wounds and bruises; and may be visited upon an unoffending spouse in such degree as to amount to cruelty even in the very strict sense in which that term ought always to be used in the law of divorce." *Ringgold* v. *Ringgold,* 128 Va. 485, 497, 104 S. E. 836. *Upchurch* v. *Upchurch,* 194 Va. 990, 76 S. E. 2d 170.

Section 20-99, Code 1950, forbids the award of a divorce upon the "uncorroborated testimony of the parties or either of them," and here the corroborating testimony is by no means conclusive. However, appellee's testimony, that of members of her family, and the exhibits show that appellant never established a home for his wife, that he humiliated her, was often rude, and he became cold and indifferent toward her and engaged in illicit relations with another woman. Though no physical cruelty was inflicted, yet it sufficiently appears that this conduct over a long period of time materially and detrimentally affected her health and nervous system.

"* * * Corroboration rests in the facts and circumstances of each

case. Only those facts necessary to the judgment must be supported." *Martin* v. *Martin*, 166 Va. 109, 116, 184 S. E. 220. *Graves* v. *Graves*, 193 Va. 659, 70 S. E. 2d 339.

The trial judge had the opportunity to see the litigants and their witnesses and hear them testify. He was thus in a position to weigh and evaluate the truth and significance of their testimony, and observe and determine the detrimental effect of appellant's conduct upon appellee. The evidence sustains the finding that appellee had been treated with such cruelty as detrimentally to affect her health and well-being and that she was justified in saying, "I am just leaving because I have taken all that I could take," and acting accordingly.

Nor do we find that appellee's sexual relations with appellant at his instance under the then circumstances condoned his long-continued course of mistreatment and cruelty. *Miles* v. *Miles*, 131 W. Va. 513, 48 S. E. 2d 669; *Hickman* v. *Hickman*, 188 Iowa 697, 176 N. W. 698, 14 A. L. R. 929; 17 Am. Jur., Divorce and Separation, § 238, § 446, pp. 421, 561. This conclusion is fortified by the fact that the next morning after appellee had returned from church, appellant did nothing to indicate a desire to have her remain or that he had any intention of treating her better in the future than he had in the past.

The evidence sustains the award to appellee of a divorce from bed and board, and the dismissal of appellant's cross-bill.

Sometime prior to the trial, appellee resigned her teaching position. She said that she did so because she was so upset and nervous that she needed a rest. However, in July, 1956, her health and nervous condition had materially improved, and she was giving serious consideration to resuming her work. It was stated in appellee's brief and conceded at the bar of this court that she resumed teaching in September and was employed in Hanover county, Virginia, throughout the 1956-57 school year where her salary was approximately the same that it had previously been.

It was also stated in appellee's brief that before appellant filed his petition for appeal, appellee indicated her willingness to accept $75 a month alimony if the contemplated appeal were abandoned, but appellant declined to accede to this offer.

There is now no indication that appellee is not fully able to perform the duties of her vocation, and she has continued to earn a salary sufficient to maintain herself in the circumstances to which she was accustomed. No doubt the fact that she was not actually em-

ployed in July, 1956, influenced the court in awarding alimony of $150 a month. Yet at the time of the trial it appears that she was interested in and would most probably be able to accept re-employment in September. We do not think that an award of $150 a month alimony was warranted by the proved facts and the then circumstances of the litigants.

In *Barnard* v. *Barnard*, 132 Va. 155, 164, 111 S. E. 227, decided in 1922, we refused to increase the award of $100 a month for support and maintenance of Mrs. Barnard and her child, whose custody she had on alternate weeks. Upon refusing to increase this allowance, we said:

"It must be borne in mind that appellee is a young woman, only twenty-eight years of age, and that under modern conditions there is open to her practically every avenue for making money that is open to her husband, that by the decree of the court she is released from her former household duties, that her time is her own, and that she had no right to remain idle at the expense of her former husband, and that it is her duty to minimize his loss, albeit it was through his fault that she was compelled to ask that the contract of marriage be rescinded."

In *Babcock* v. *Babcock*, 172 Va. 219, 1 S. E. 2d 328, this court, upon reversal of the trial court and the award of a divorce from bed and board to Mrs. Babcock, quoted with approval from the *Barnard* case, *supra*, and denied her any alimony.

Mr. Justice Spratley, in *Hulcher* v. *Hulcher*, 177 Va. 12, 18, 12 S. E. 2d 767, where the husband's application to discontinue the alimony was refused and the moderate award made by the trial court was continued in force, pointed out that there was no prospect of employment open to Mrs. Hulcher and commented upon the *Barnard* and *Babcock* decisions as follows:

"* * * It is sufficient merely to say that in those two cases the women had opportunities for earning a livelihood, whereas no such prospect appeared for Mrs. Hulcher. The income Mrs. Hulcher received from an inherited estate was taken into consideration and used as a basis for the reduction granted her former husband."

Section 20-107, Code 1950, provides that upon decreeing a divorce "the court may make such further decree as it shall deem expedient concerning the estate and maintenance of the parties, or either of them."

The allowance of alimony, if any, and if awarded, in what amount,

are matters within the sound discretion of the court. In exercising his discretion, the chancellor should not award alimony as punishment to a transgressor husband or as a reward to a wronged wife. *Hulcher v. Hulcher, supra*. Its denial or allowance, in any sum, is to be determined with reference to established principles of law relating to the subject, and upon an equitable consideration of all the facts and circumstances of the case.

Here the record and concessions at bar conclusively show that appellee is an educated woman who is now well equipped to earn her own livelihood. For many years she has earned a salary that is ample to maintain her in the station in life to which she has been accustomed, both before and during her marriage. This being true, the award of alimony was excessive and the facts and circumstances now disclosed are such as to justify and prompt the disallowance by us of any alimony.

So much of the decree of July 26, 1956, as granted a divorce *a mensa et thoro* will be affirmed, but the part that awarded alimony will be reversed, and the cause remanded for such further proceedings therein as may be proper and not in conflict with the views herein expressed. Counsel for appellee will be allowed a fee of $200 for services in this court, and appellee will recover her costs.

*Affirmed in part; reversed in part, and remanded.*

SPRATLEY AND BUCHANAN, JJ., dissenting in part.

BUCHANAN, J., dissenting in part.

I disagree with the conclusion that there should not be an allowance of any alimony in this case. The court finds the facts to be that the husband never established a home for his wife; that he humiliated her, was rude and indifferent to her and engaged in illicit relations with another woman; and that his conduct over a long period of time adversely affected her health and nervous system to the point where she was justified in leaving him because she had taken all that she could take.

This case is not like the *Babcock* case (172 Va. 219, 1 S. E. 2d 328). There, as the court pointed out, the husband was past seventy, a retired minister, not in good health, and with a small income, part of which had to be used for an afflicted son; while the wife was com-

paratively a young woman and more capable of earning a living than her husband.

Here the husband is forty-one years old, owns some property and has a salary of some forty-one hundred dollars a year after deductions for income tax and social security. His conduct affected her health, caused her to seek medical aid, and to resign her teaching position, although her health has now improved and she has resumed teaching. Here is a husband who has been unfaithful to his marriage vows and has been guilty of cruelty of such degree as amounts to desertion and entitles her to a divorce. He should not be allowed to walk so carefree out of the marriage relation he has disrupted and away from all further obligations to the wife he has wronged.

"A decree for alimony is something more than an order for the payment of money. A husband who has wronged his wife must continue to contribute to her support. A decree for alimony 'is an order compelling a husband to support his wife, and this is a public as well as a marital duty—a moral as well as a legal obligation.' Branch v. Branch, 144 Va. 244, 132 S. E. 303, 305." Capell v. Capell, 164 Va. 45, 49, 178 S. E. 894, 895.

Alimony "stems from the common-law right of the wife to support by her husband, which right, unless the wife by her own misconduct forfeits it, continues to exist even after they cease to live together." Eaton v. Davis, 176 Va. 330, 338, 10 S. E. 2d 893, 897.

"Where the delinquency of the husband has been established and the wife has been compelled to seek a divorce on account of his misconduct, while alimony is not to be used as a method of punishment, 'the court will not seek to find how light the burden may possibly be made, but what, under all the circumstances, will be a fair and just allotment.' * *." Hawkins v. Hawkins, 187 Va. 595, 601, 47 S. E. 2d 436, 439.

I would grant the wife $75 a month as "a fair and just allotment" in this case. The court below indicated that the alimony granted by it should be reduced when the plaintiff went back to work and she offered to accept this amount before the petition for appeal was filed.

Mr. Justice Spratley joins in this dissent.