# Richmond

## HERMAN FOSTER DAVIS v. LOUISE MADDUX DAVIS.

January 12, 1948.

Record No. 3279.

Present, Hudgins, C. J., and Eggleston, Spratley, Staples and Miller, JJ.

The opinion states the case.

*John B. Boatwright* and *A. L. Pitts, Jr.*, for the appellant.

*William I. Moncure*, for the appellee.

MILLER, J., delivered the opinion of the court.

This is a suit for divorce brought by appellant, Herman Foster Davis, against appellee, Louise Maddux Davis. Appellee filed a cross-bill and was awarded a divorce from bed and board, custody of their infant daughter, Betty, and support for the child. From that decree this appeal was awarded and appellant seeks a reversal thereof in all particulars.

The original bill of complaint, filed September 25, 1944, charged the appellee with cruelty and constructive desertion. This bill neither sought nor prayed for the custody of the then nineteen months old child. Other pleadings which will hereinafter be mentioned were filed at a later time by each of the litigants.

About six months prior to the institution of this suit, Herman Foster Davis had been honorably discharged from the armed forces of the United States where he had served for a year. Subsequent to the date of discharge and until the separation of the parties in September 1944, he and ap-

pellee lived at the home of her parents. Their residence was in Nottoway County and not far distant from Camp Pickett.

After the filing of the bill of complaint, this suit lay dormant until April 4, 1945. On that date, Louise Maddux Davis .filed a petition praying for temporary custody of the infant child and for injunctive relief, all of which was that day granted. That move on her part was precipitated by the hereinafter mentioned event of the previous day.

After the parties separated, the wife and child continued to reside at the home of her parents in Nottoway County. Through the ensuing months appellant occasionally visited his infant daughter for a few hours at a time. On the afternoon of April 3, 1945, he came to this home where the child, then in. the care of her nurse, was playing in the yard. Without disclosing his intention to anyone he took the child and departed in his automobile. None of the child's clothing or other necessities for such an infant were obtained. Extensive search was made by appellee and her family to locate the appellant and child, but to no avail.

Subsequent developments disclosed that he had departed with Betty and driven by automobile to the State of California. He kept her there until December 1945. The decree of April 4, 1945, awarding temporary custody of the child to appellee was thereby rendered unenforceable. In October of 1945, he returned to Virginia alone and remained here for several weeks. While in Virginia he refrained from communicating with appellee as to the welfare or whereabouts of Betty. In fact, appellee did not then know of his presence here. In November or December he again went to California, secured the child, returned to Virginia, and soon thereafter took up his abode at the home of his parents near Dillwyn in Buckingham County. Appellee did not know where her husband and child were until December of 1945. She was not then advised by him or any of his family, but by mere chance learned that he and Betty were in Buckingham County.

After appellant's return from California further plead-

ings were filed. These will be mentioned in sequence before a brief recital of the evidence is made.

On February 6, 1946, appellant filed an amended bill and an answer to appellee's petition. He reiterated his charge of desertion and asserted that his wife's indifference toward him was due to her affection for a young army officer who had been stationed at Camp Pickett, but who was then in foreign service. He further alleged that since filing his original bill of complaint he had discovered certain letters containing endearing terms written by this officer to his wife which disclosed that she no longer cared for appellant. He also asked for custody of Betty and maintained that his removal of her on April 3, 1945, was on advice of counsel and because appellee was not a proper custodian. In appellee's answer and cross-bill filed July 16, 1946, she denied the alleged desertion, charged her husband with desertion and non-support, prayed for a divorce *a mensa et thoro* and custody of the infant child.

The parties in this suit testified at length and numerous witnesses were heard on behalf of each. The decision of the chancellor under review is so eminently correct and well supported by evidence that discussion of the testimony of the many witnesses would serve no good purpose. It is not amiss, however, to recite briefly the following salient facts that appear from the record.

When appellant returned from army service on April 25, 1944, he resumed his residence with his wife and child at her parents' home. He was nervous and restless and failed to apply himself with constancy to any of the several positions he secured. He prepared no separate residence for his wife and child and was the one who actually left their abode in Nottoway County. He claims that he could have secured, and offered to establish, a home for his wife and child in Dillwyn or Richmond, but this she denies. A careful scrutiny of the evidence fails to disclose sufficient provision of a home by him for his family or steady employment on his part rendering it advisable, much

less obligatory upon his wife, to leave her then abode and its security.

In his testimony he asserted that appellee advised him that she did not love him. He also placed emphasis on the letters received by appellee from the officer who had left Camp Pickett for overseas duty early in the year 1944. It is contended that the contents of these letters, and the testimony of one or two witnesses as to some display of affection between appellee and such officer establishes the reason for alleged coolness to appellant. This, he says, coupled with her statement that she did not love him, constituted proof of her intent to sever matrimonial relations.

It is, however, significant that appellant testified that he found and read the letters on April 26, 1944. She asserted that he did not find them, that she had broken off this correspondence, and had voluntarily revealed these letters to appellant. Due to the attitude and conduct of appellant, her version seems more reasonable. The letters, six in number, and one written by her to a relative appear in the record. They disclose that such correspondence was carried on for a month or two. However the letters may have come into his possession, appellant did not at first attach much importance to their contents. He continued to live with his wife until September 1944, and failed to make any mention of this incident in his bill of complaint filed during that month.

While the letters contain expressions of endearment, and disclose affection between the parties concerned, they fail to establish any very serious misconduct. The correspondence was definitely broken off by appellee months before she and her husband separated. Thus her indiscreet and uncommendable conduct as disclosed by and incident to the correspondence had been long discontinued and condoned. No breach of the matrimonial relations had then occurred. This wholly fails to prove desertion. *Haskins* v. *Haskins*, 185 Va. 1001, 41 S. E. (2d) 25.

Neither party is wholly free from fault, but the evi-

dence falls short of establishing either intention to desert or cruelty on the part of appellee.

It is further contended that her attitude continued cool and indifferent, that she did not care for her husband, denied him normal sexual intimacy for an unreasonable length of time, and made it apparent that she did not wish to live any longer with him. His testimony is to the effect that immediately before he left there was lack of sexual intimacy for as much as a month. This, he asserts, drove him away. But there is no evidence of long-continued refusal of sexual relations. Mere coolness at times and periodical refusal of sexual intercourse alone, with the marital relationship otherwise unimpaired, does not constitute desertion. *Ringgold* v. *Ringgold,* 128 Va. 485, 104 S. E. 836, 12 A. L. R. 1383; *Wills* v. *Wills,* 74 W. Va. 709, 82 S. E. 1092, L. R. A. 1915B, 770; *McKinney* v. *McKinney,* 77 W. Va. 58, 87 S. E. 928.

In *Ringgold* v. *Ringgold, supra,* it is said at page 495:

"It is very generally held that where the marriage relation remains otherwise unimpaired, the mere cessation of marital intercourse in the sexual sense, though without justifying cause, does not amount to either cruelty or desertion within the meaning of the divorce laws."

A further and complete answer to the charges of cruelty and desertion is appellee's denial thereof and the lack of corroborating testimony in support of appellant's contention.

There is no doubt that appellant left his wife and departed from the home they then occupied. He ultimately removed his furniture and sold it. This was not justified by anything she had done, nor is it sufficiently explained by him. The conclusion reached by the chancellor that appellant's conduct constituted willful desertion was fully justified.

To whom should the custody of the infant child Betty be awarded? If to the father, the child will be placed in the home of his parents where he may or may not live.

If ·the appellee retains custody as determined by the decree of the lower court, the child will be with her mother in the home of her maternal grandparents.

In the determination of this question, it has repeatedly been said that the welfare of the infant is the paramount consideration. *Elam* v. *Elam*, 182 Va. 469, 29 S. E. (2d) 222; *Hayes* v. *Strauss*, 151 Va. 136, 144 S. E. 432. But the rights of the parents are to be considered and regarded. *Surber* v. *Bridges*, 159 Va. 329, 165 S. E. 508; *Fleshood* v. *Fleshood*, 144 Va. 767, 130 S. E. 648. Their rights are greater than and they are favored as custodians over grandparents. *Sutton* v. *Menges*, 186 Va. 805, 44 S. E. (2d) 414.

With due regard to the best interests of Betty and the rights of the parties, it is proper to examine the evidence and determine the qualities of each parent as custodian, character of the environment offered in each home and locality, and who would actually have custody and control of the child.

Appellant's restlessness and apparent inability to apply himself with any degree of permanency to the many positions he has secured is deplorable. His conduct and judgment in taking this very young child to California and there keeping her for months without communication with the mother does not lend itself to our approval. If custody of the child be awarded to appellant, it is his intention to place her in the home of his parents near Dillwyn, Virginia. This is a comfortable, well-ordered, and moral home. If Betty remained there she would no doubt be properly reared and well cared for by her paternal grandparents. But whether the appellant will make this his home and.so give to the child his care and fatherly affection is problematical. In his testimony he fails to make clear where his future home may be. That is wholly undetermined.

It appears that appellee was, so long as she had the care and custody of her child, a devoted, understanding and proper mother. The residence of her parents, where

it is her expressed and apparent intention to live, is also an entirely suitable and moral home. Here the child would enjoy surroundings and associations similar in comfort and environment to those offered in the home of the paternal grandparents. In addition, Betty would have the benefit of her mother's personal love and care.

The evidence discloses that if custody be granted to the father, it would in fact be the custody of the paternal grandparents. They would have the personal care and rearing of the child. So far as the actual care, custody, and immediate control of the child is concerned, the paternal grandparents are in reality the claimants, through the appellant, as against the mother. The two homes and other physical advantages are similar. In one, the child would be under the care and control of its grandparents,— in the other, under the care and control of its mother.

In view of the above circumstances, the best interests of the child and the rights of the parties clearly establish the priority of appellee's claim to such custody. *Sutton* v. *Menges, supra.*

The decree appealed from fixed certain hours when appellant could visit Betty, and he was also allowed to have her visit him twice a year at reasonable intervals therein specified. After appellant instituted suit seeking the aid of the court, and while this young child was actually in the care of her mother, he, without first obtaining consent of the court, or of the then custodian, took Betty beyond the court's jurisdiction. There he kept her for eight or nine months. Before he is allowed the rights granted in the decree, he, or someone for him, should be required to execute bond, with surety, in a reasonable sum to be determined by the chancellor and conditioned that he abide by the terms of the decree. *Kern* v. *Lindsey*, 182 Va. 775, 30 S. E. (2d) 707.

The evidence is meager as to appellant's earning capacity. However, he testified that he could properly provide for his child. In fact he asserted his ability to maintain a home and adequately support his wife and Betty.

This is sufficient evidence on which to base the award of forty dollars per month decreed for the child.

A careful review of the testimony reveals that it abundantly supports the conclusions of the chancellor in all respects.

An additional fee of $100.00 is allowed counsel for appellee for his services in this court and the decree of the trial court will be enlarged to include such additional compensation. The lower court shall also by appropriate decree determine the amount of bond to be given before the appellant is allowed the rights mentioned in the final decree and this case is remanded for such further proceedings as may be authorized by law.

*Amended, affirmed and remanded.*