# Richmond

ALEXANDRA CANAVOS v. CHRIS CANAVOS.

May 4, 1959.

Record No. 4912.

Present, Spratley, Buchanan, Miller, Whittle, Snead and l'Anson, JJ.

The opinion states the case.

*Alexander H. Sands, Jr.* and *Frank H. Pitchford* (*Sands, Marks & Sands*, on brief), for the appellant.

*Henry D. Garnett*, for the appellee.

I'ANSON, J., delivered the opinion of the court.

Chris Canavos, the appellee, filed a bill of complaint on February 19, 1953, alleging that Alexandra Canavos, his wife, the appellant, in September, 1938, deserted him at his home in Newport News, Virginia, and prayed for a divorce *a vinculo matrimonii*. On February 28 the appellant filed an answer denying the alleged desertion, praying that the court deny the relief asked for and that the appellee be required to support the appellant and their infant son, whose custody she requested. The appellant averred that she wanted to live with the appellee and did not ask for a divorce. The deposition of John A. Gallins was taken on March 7, 1953, and was the only testimony offered by the appellee at that time. There being no further proceedings for nearly four years, the cause was dismissed from the docket by an order entered February 27, 1957. On July 18, 1957, the cause was reinstated upon motion of counsel for the appellee, depositions were taken over a period of several months, and on December 30, 1957, the chancellor entered a decree granting the appellee a divorce *a vinculo matrimonii* on the grounds of desertion, awarded custody of the infant child to the appellant and ordered the appellee to pay to the appellant the sum of twenty-five dollars per week for the support of the child. From this decree we granted an appeal.

The appellant's sole assignment of error is that the evidence does not support the decree of the chancellor granting the appellee a divorce.

The parties were married in Greece on December 28, 1924. It was understood by both parties at the time of the marriage that the appellee would leave shortly thereafter for the United States where he had business interests and the appellant would live in the home of his mother and father in Kalesmeno, Greece, until he returned for her.

About one week after the marriage the appellee departed for the United States and stayed away from Greece for nearly two years, returning in November, 1927. The parties lived together until April, 1928, when again, by mutual consent, the appellee left for the United States. Nine months later he returned to Greece where they lived together for one month and in April, 1929, they left for the United States.

The parties lived together in Newport News, Virginia, from April,

1929, until November, 1933, when they returned to Greece with their two sons, Dennis, born in 1928, and Sam, born in 1930.

The family resided in the home of the appellee's mother in Kalesmeno until the appellee completed the building of an expensive home for his family in Karpenision, Greece. In January, 1935, the appellee left Greece for Newport News.

The appellee returned to Greece in April, 1937, and lived with the appellant for six months before returning to Newport News in September, 1937. He went back to Greece in May, 1938, and lived with the appellant until August, 1938, when he returned to Newport News. War broke out in Europe in 1939, and the appellee has not been back to Greece since he left in August, 1938.

The appellee sent money regularly for the support of his wife, three sons (the third son having been born in 1939) and his mother until Greece was overrun by her enemies in 1941 and all communications were severed with the outside world. He did not resume his support of the appellant after the war except for a short period after 1947.

At the end of the war in 1946 the appellee arranged to bring his two oldest sons to Newport News to help him in his business. The relationship between the appellee and the two sons became strained and they both ultimately left him.

The appellee made no effort to bring the appellant and their youngest son, whom he had never seen, to Newport News. Although she had expressed a desire to join him, he made it plain to the appellant through correspondence that he did not want her to come.

In 1952, without the appellee's knowledge, and through the aid of the two oldest sons, the appellant and the youngest son arrived in Newport News late one night and went to his restaurant to join him. The appellee was enraged when he saw the appellant. He refused to permit her and their youngest son to stay in his home. The appellee did, however, arrange for their temporary lodging at a hotel and later rented an apartment for them. The appellant tried on several occasions to bring about a reconciliation but the appellee refused to live with her.

The appellee contends that when he left Greece in August, 1938, to return to Newport News the appellant refused to come with him and that such refusal constituted constructive desertion.

The appellee testified that he took the appellant and their children back to Greece in 1933 at her insistence because she was not happy

living in Newport News and wanted to be near her people. He stated that on many of his visits to Greece he asked her to return with him to the United States but she refused; that on his last visit in 1938 he told her that if she did not return with him this would be her last opportunity to ever live with him as his wife; that she told him she was not going back to the United States to live with him; that prior to his departure for the United States in August, 1938, he and the appellant did not get along very well; that she was always nagging him and insisting that he remain with her in Greece; that he only lived with her a part of the time on his last visit because he could not stand the sight of her; that she was a dirty, filthy woman and would not listen to him and be a wife to him (although he did get her pregnant); that he had tried to be a good husband and father; that he had never been happy since they were married; that it was one of those marriages which was arranged by the respective families in accordance with Greek custom and that he told his father two days after they were married "he had gotten him in the mud."

John D. Gallins, who had known both the appellee and the appellant for a number of years, testified that he talked with the appellant while she was living in Newport News and that she told him she did not like living in the United States and wanted to return to Greece. When he was visiting in Greece in 1937, 1940 and 1946 the appellant told him on each occasion that she did not want to go back to the United States.

Many outstanding citizens of the community testified to the excellent reputation of the appellee for truth and veracity.

The testimony of the appellant and her witnesses is in direct conflict with that of the appellee. She testified that when she arrived in Newport News in 1929 she thought she was in heaven; that she did not want to return to Greece in 1933; that when appellee told her he was taking her and the children back she began to cry because she didn't want to be separated from her husband; that he told her he was going to build a home in Greece and, after one more trip back to the United States, he would return to Greece to live with her permanently; that she went back to Greece because under Greek custom a wife has to do what her husband tells her; that after the appellee built the home he told her he was going to spend three months out of the year with her in Greece, one month for travel, and eight months in the United States; that she told him she did not like the arrangement; that before the appellee left her in Greece in August, 1938, he told her he thought war was going to break out

and he was going back to the United States; that she begged him to take her and the children back with him because, if war did break out, they would be blocked in Greece but he refused to do so; that he promised to return in 1939 and bring back an automobile; that she became pregnant with her last child on appellee's last visit in 1938; that she had never refused to return to the United States or live with him at any time; that the first time she knew her husband had accused her of desertion was when this suit was instituted; that on the night she arrived in Newport News in 1952 the appellee threatened to kill her and the son who arranged for her to come to Newport News, cursed and abused her, tore her coat, and put her out of his place of business, and that when she went to appellee's place of business two days after arrival here and asked him for a cup of coffee he slapped her.

The appellant's testimony was corroborated by her three sons and several other witnesses.

The appellant and the appellee corresponded with each other and the appellant introduced into evidence eleven letters received from the appellee which were translated from Greek into English. The appellee did not produce any of the letters written to him by the appellant.

The first letter, in point of time, was dated February 26, 1935. It indicated that the parties were on the best of terms; that he considered Greece his home, and that he intended coming back to Greece to live permanently.

A letter dated October 15, 1945, was the first one received by the appellant after the war. It acknowledged her letter requesting that she and the boys be permitted to come to the United States. The appellee expressed a desire for the two oldest boys to come so that they could help him in his business, but stated that she could not come because he was returning to Greece.

A letter dated November 9, 1945, addressed to his wife, son and mother, showed he was disturbed over the destruction during the war of his many prized and valuable possessions and stated that after he brought the boys to the United States he would return to Karpenision and "fix the house."

In reply to a letter written by appellee's mother asking him to take appellant to the United States he wrote, on January 24, 1946, that he would not bring his wife to the United States because he wanted to live with her in Karpenision and to be buried there.

In a letter dated October 10, 1946, addressed to his wife, youngest

son George and his mother, the appellee referred to the appellant as his "little wife." He told her that she was not to worry; that he was going to sell his United States real estate and come to Greece in the spring; that he knew the two sons wanted her to come to the United States and she should not listen to the sons but to listen to and obey him; that they would "live good" in Athens; that he had made a will leaving everything to the appellant and their youngest son and that he and she would get along all right.

By letter dated November 7, 1946, addressed to appellant, the appellee sent her $200.00 to "buy anything she wants," referred to her as "my darling" and ended "sweet kiss you." He told her if she did not obey his every wish he would write her that she was not his wife; that he had heard she was thinking of coming to the United States and warned her if she did anything "so stupid" he "will leave you all."

In a letter of December 14, 1946, he told the appellant that he and she would rebuild the home destroyed by the Germans; that they would live together and have a winter home in Athens, a home in Kalesmeno, a $200,000 building in the United States, and an income of $2,000 per month from rentals. He boasts of having had a "honey" with him in his automobile on the night he was writing to the appellant. He wrote that he realized such news would "make you nervous but you should be proud to have a husband like that with all the beautiful girls waiting in line for him to go riding in first class automobile," and that he would bring his car to Karpenision but was afraid since he had read in the newspapers about "so many things going on every day."

We find endearing terms in most of the letters introduced into evidence, addressed to the appellant by the appellee, until one dated May 20, 1950, in which the appellee berated the appellant for not promptly signing a power of attorney for him and ended it with language severing all relations because she would not obey him. However, she did sign later and send to him the power of attorney he asked for.

The appellant seeks a reversal of the chancellor's decree on the grounds that it is not supported by the evidence. While a decree based upon depositions is not as strong and conclusive as one based on evidence heard *ore tenus*, it is presumed to be correct, even though the evidence may be in sharp conflict, and the burden is on him who seeks to overturn it to show that it is manifestly wrong. The decree will not be reversed if it is reasonably supported by substantial,

competent, and credible evidence. *Stutzman* v. *Nash & Son,* 189 Va. 438, 443, 53 S. E. 2d 45, 47; *Ashby* v. *Dumouchelle,* 185 Va. 724, 731, 734, 40 S. E. 2d 493, 496; 1 Mich. Jur., Appeal and Error, § 280, pp. 712, 713.

The chancellor found from the evidence that the appellant's refusal to return to the United States with the appellee in August 1938 constituted constructive desertion.

The principle is well-settled that if a wife refuses to accompany her husband upon his change of residence for business reasons, without legal excuse, she is guilty of desertion (*Graves* v. *Graves,* 193 Va. 659, 661, 70 S. E. 2d 339, 340) but we do not agree with the learned chancellor that it is applicable under the evidence in this cause.

The evidence discloses that one week after the marriage of the parties the appellee began dividing his time between the United States and Greece and his plan of traveling back and forth was interrupted by the war. When he returned to Greece with his family in 1933 and built an expensive home in Karpenision there was every indication he wanted the appellant to live there and look after their children and his widowed mother while he spent many months out of each year in the United States looking after his business and the remaining time with his family in Greece.

The letter of February 26, 1935, written by the appellee to the appellant establishes that the parties were on the best of terms and that he would return to Greece according to plans because he considered it to be his home. He went back to Karpenision in 1937 and again in 1938. He promised to return to Greece in 1939 but was prevented by the outbreak of war. It was on his trip in 1938 that he said he insisted that his wife return with him to the United States and she refused. Yet he testified that he and the appellant were not getting along very well, that he could not stand the sight of her, and that she was filthy and dirty. It seems strange that he would want her to return with him to the United States under the conditions then existing.

In 6 Mich. Jur., Divorce and Alimony, § 32, p. 295, it is stated:

"Acts done by one of the parties to a suit prior to its institution, which are entirely inconsistent with the testimony given by him upon trial, will be given great weight in determining what credence should be given to his oral testimony in conflict with the testimony of his adversary."

See *Rice* v. *Rice,* 88 W. Va. 54, 106 S. E. 237, 239.

The evidence of the appellee that the appellant refused to return

to the United States with him in 1938 is effectively controverted by letters received by the appellant from the appellee immediately after the war and during the years from 1945 through the middle of 1950. They give credence to the testimony of the appellant and her witnesses that he did not want her to live with him in the United States after 1933.

The letters show conclusively that the appellee still considered the appellant his wife. He never mentioned in any of his letters that the appellant had refused to come with him to the United States. He referred to her as his "little wife," "my darling," and sent "kisses" to her. The appellee told the appellant that he had made his will leaving everything to her and his youngest son, George, and of his plans to return to Karpenision to fix the house that had been damaged by the Germans during the war and that they would live "good" together.

In many of his letters the appellee told the appellant that she could not come to the United States because he was returning to Greece. The appellee's refusal to bring her to the United States is consistent with the appellant's testimony and that of her witnesses that appellee's plans were for her to stay in Greece and look after his aged mother and the children and he would visit them and live with them three months out of the year. When the appellant did come to Newport News through the efforts of her sons he rejected her.

The testimony of John D. Gallins that the appellant told him in 1946 she did not want to go back to the United States is controverted by letters written by the appellee to appellant in answer to her request that she be permitted to come to Newport News. Serious doubt, therefore, arises as to the truthfulness of Gallins' testimony that the appellant told him in 1937 and 1940 that she did not want to go back to the United States. The appellee himself could not have had much confidence in Gallins' integrity because he wrote his (appellee's) mother in 1946 not to let Gallins come anywhere near her home and "every time she saw him to throw rocks at him." All of this gives weight to the testimony of the appellant's witnesses that Gallins' reputation for truth and veracity was bad.

The testimony of the appellee lacks the corroboration required by statute. A divorce will not be granted on the uncorroborated testimony of the parties or either of them. Sec. 20-99, Code of 1950.

We are of opinion that the decree of the chancellor awarding the appellee a divorce is not reasonably supported by substantial, competent and credible evidence. The part of the decree appealed from

awarding the appellee a divorce and settling the property rights of the parties is reversed and vacated. The cause is remanded to the court below and the chancellor is directed to ascertain and fix the amount of money to be paid to the appellant for her separate maintenance. A fee of $250 is allowed for appellant for prosecuting this appeal.

*Reversed and remanded.*