# Richmond

VERNON NELSON HOBACK v. VIRGINIA MAE GUY BEAVERS HOBACK.

December 4, 1967.

Record No. 6491.

Present, Eggleston, C.J., and Buchanan, Snead, I'Anson and Gordon, JJ.

Carl C. Gillespie (*Gillespie & Gillespie*, on brief), for appellant.

Donald R. Mullins (*G. R. Brittain*, on brief), for appellee.

I'ANSON, J., delivered the opinion of the court.

On July 6, 1965, Virginia Mae Guy Beavers Hoback, complainant, filed her bill against her husband, Vernon Nelson Hoback, defendant, seeking a divorce *a mensa et thoro*, to be later merged into an absolute divorce, on the ground that defendant's conduct toward her was so cruel as to amount to constructive desertion, and praying for alimony. Defendant filed an answer and cross-bill in which he prayed for a divorce *a mensa et thoro* on the ground of desertion, with permission to merge into an absolute divorce at the proper time.

The evidence was taken by depositions, and the chancellor entered his decree on June 27, 1966, dismissing defendant's cross-bill and granting the complainant a divorce *a mensa et thoro* "on the grounds of desertion and abandonment" and awarding her alimony.

Complainant was a widow, 41 years of age, and defendant a widower, 54 years of age, when they were married in Tazewell county, Virginia, on June 20, 1964. There were no children born of this marriage, but both parties have grown children by their previous marriages. Complainant also had a 16-year-old son who lived with her at the time of her marriage to defendant. Upon their marriage the complainant rented out her home in Cliffield, Tazewell county, and she and her son moved into defendant's home in North Tazewell.

Complainant testified that she and defendant got along very well for the first two months of their marriage, but shortly thereafter he started acting cool toward her and told her that had he waited another week he would not have gotten married. Defendant did not consult her when he bought groceries and did not buy her enough milk, which she "practically lived on." He refused to let her rearrange the furniture in the home or change the pictures on the walls; pulled up flowers she had planted; would clean the house after she had cleaned it; fixed his own breakfast; spent much of his free time visiting his mother in Tazewell; and would turn his back to her when they were in bed together. After they had lived together for about two months, she told defendant that they had made a mistake in marrying because they were not suited for each other, and that she did not like living in North Tazewell. Sometime in January or February, 1965, she told defendant that she had consulted a lawyer about obtaining a divorce. However, they continued to sleep together intermittently until March or April, 1965, when she took her pillow and went into another bedroom because of his coolness toward her. But each morning she would place her pillow back on defendant's bed. She said defendant had not been able to perform

sexually during the entire time they lived together. He never threatened or used abusive language toward her; "he just turned against me." She said defendant bought a new refrigerator, stove and hot water heater for her rented home as an inducement for her to go back there to live. As a result of defendant's treatment she became very nervous, had to seek medical attention, and lost ten pounds.

In the early part of June 1965 complainant and her son visited her married daughter in Manassas, Virginia, for approximately two weeks. When they returned home from the visit she found that defendant had taken her pillow off of their bed and "thrown" it on the guest room bed, and that he had packed her "what-nots and several other things in a box." She said that she "had not planned on moving out," but when she got back home and "seen what I seen then" she got "mad" and decided to leave. She left the home on or about June 28, 1965, and did not return except to pick up some of her belongings.

Complainant's son testified that defendant was very good to him; that he never heard him raise his voice at his mother or use any rough language toward her; that defendant provided his mother with an automobile and paid all expenses of its operation and upkeep; and that they never lacked for food. He said that several weeks after the marriage it seemed like defendant began to ignore his mother and would not let her do anything the way she wanted to in the house. His mother was on edge all the time as a result of his step-father's attitude, and several months prior to the separation he heard defendant tell his mother that he was going to buy some furniture so she could move back to her home.

Shirley Crouse, a married daughter of the complainant, and her children visited in the Hoback home for three weeks in August 1964. She testified that the parties seemed to get along well at that time. She and her children again visited in the Hoback home for a week in May 1965. On this visit she noticed that defendant ignored her mother and that they were not getting along too well together. While she was there her mother did all the cooking and housework. Defendant did not make her feel unwelcome on either of her visits, but he is a very reserved person and does not have much to say.

Mrs. John Guy, mother of the complainant, testified that she visited in the Hoback home sometime in January or February 1965, and defendant asked her if she thought her daughter was going back to live in her house in Cliffield. She told him that she did not know, but that her daughter did not seem to be satisfied. Defendant then told

her he was "sorry he got her into this mess." She did not see defendant commit any unkind act or utter one unkind word toward her daughter while she was visiting in the home.

Defendant testified that after they had been married about two months complainant told him that she knew within a week that they were not "sexually suited" for each other. Several months after their marriage, complainant told him that she had consulted a lawyer about getting a divorce and he told her to give herself time to get adjusted. He bought groceries at her request, and she made no complaint except when he cut down on the amount of milk purchased because she was not drinking all that he bought. He cleaned the house at times because she told him that since he liked the house and she did not, he would have to keep it clean. She rearranged the furniture in the house, and when he told her he did not like it they changed it back. He pulled up the flowers complainant had planted because they were dead, but put others in their place. Complainant asked him to buy the refrigerator, stove and hot water heater for her home and her brother installed the water heater. He said that he had normal sexual relations with complainant, but she did tell him several times that they were not "sexually suited." The only complaint she made was of the infrequency of the relations.

Bessie Hoback, mother of the defendant, and Elsie Elswick testified that complainant told them sometime following the marriage that she did not know what good treatment was until she married the defendant.

[1] The decree of a chancellor based upon depositions is not as strong and conclusive as one based upon evidence heard *ore tenus*, but it is presumed to be correct and will not be overturned by us if it is reasonably supported by substantial, competent and credible evidence. *Martin* v. *Martin*, 202 Va. 769, 773, 120 S. E. 2d 471, 474 (1961); *Canavos* v. *Canavos*, 200 Va. 861, 866, 108 S. E. 2d 359, 363 (1959).

[2] Thus our inquiry is directed to whether there is substantial, competent and credible evidence to support the chancellor's decree holding that the conduct of the defendant toward his wife was such as to justify her leaving his home, thereby making him guilty of constructive desertion.

We have many times said that "one spouse is not justified in leaving the other, unless the conduct of the other is sufficient to establish the foundation of judicial proceeding for a divorce." *Wimbrow* v.

*Wimbrow,* 208 Va. 141, 143, 156 S.E. 2d 598, 601 (1967); *Lawyer* v. *Lawyer,* 207 Va. 260, 264, 148 S. E. 2d 816, 819 (1966).

We have recognized that evidence of violence or apprehension of bodily harm are not indispensable ingredients in divorce suits charging cruelty, and that mental anguish, repeated and unrelenting neglect and humiliation may be visited upon an unoffending spouse in such degree as to amount to cruelty in the sense the term is used in the law of divorce. *Ringgold* v. *Ringgold,* 128 Va. 485, 497, 104 S. E. 836, 840, 12 A.L.R. 1383 (1920); *Baytop* v. *Baytop,* 199 Va. 388, 392, 100 S. E. 2d 14, 17 (1957). But misconduct of an offending spouse which will justify the other in leaving must be so serious that it makes the marital relationship intolerable or unendurable. *Hoffecker* v. *Hoffecker,* 200 Va. 119, 125-126, 104 S.E. 2d 771, 776, 76 A.L.R. 2d 412 (1958); *Williams* v. *Williams,* 188 Va. 543, 549, 50 S. E. 2d 277, 279 (1948); *Butler* v. *Butler,* 145 Va. 85, 88, 133 S. E. 756, 757 (1926).

Here there is evidence that defendant's performance of certain household duties usually performed by the wife and his lack of affection toward her caused her to become unhappy and dissatisfied with the marriage. As a result of her dissatisfaction she consulted an attorney several months after their marriage about obtaining a divorce, but after that she continued to live with defendant, occupied the same bed practically the entire time they lived together, and took care of all the household duties except the few performed by the defendant. She admitted that she had not intended to leave defendant until she returned home from her trip to Manassas and found that he had taken her pillow off their bed and packed some of her "what-nots and several other things." Thus it is apparent that complainant had not regarded the conduct and attitude of the defendant toward her to be of such a cruel nature that cohabitation with him became intolerable. Moreover, there is no corroboration of complainant's testimony, as required by Code § 20-99, that defendant excluded her from his bedroom and had packed some of her belongings when she returned from Manassas.

[3] It is true complainant's evidence showed that defendant was cool toward her and turned his back to her while they were in bed together, but her claim that defendant was unable to perform sexually *was not* alleged in her bill and she made no mention of it until called to testify in rebuttal after the depositions had been taken.

Generally, mere coolness and denial of sexual intercourse, where

other marital duties are performed, do not constitute cruelty or desertion in the sense used in the law of divorce. *Albert* v. *Albert*, 137 Va. 1, 3, 119 S. E. 61 (1923); *Davis* v. *Davis*, 187 Va. 63, 69, 45 S. E. 2d 918, 921 (1948); *Gallaher* v. *Gallaher*, 147 W. Va. 463, 471, 128 S. E. 2d 464, 470 (1962). Compare, *Ringgold* v. *Ringgold*, *supra*, 128 Va. at 498-499, 104 S. E. at 841; *Chandler* v. *Chandler*, 132 Va. 418, 430-431, 112 S. E. 856, 860-861 (1922).

We are of opinion that the chancellor's decree granting complainant a divorce *a mensa et thoro* on the grounds of "desertion and abandonment for a period of less than one year" is not supported by substantial, competent and credible evidence, and since the evidence shows that complainant deserted defendant without sufficient cause the chancellor erred in not granting him a divorce *a mensa et thoro* on the ground of desertion.

[4] The case is remanded to the court below with direction to grant defendant a divorce from the bonds of matrimony without the entry of a decree *a mensa et thoro* if the court is of the opinion that no reconciliation has taken place or is probable (Code § 20-121.01), and to allow complainant's attorneys a fee of $150 each for representing her on this appeal.

*Reversed and remanded.*