## Richmond

THE FIDELITY AND CASUALTY COMPANY OF NEW YORK v. THE FIRST NATIONAL EXCHANGE BANK OF VIRGINIA.

THE FIRST NATIONAL EXCHANGE BANK OF VIRGINIA v. THE FIDELITY AND CASUALTY COMPANY OF NEW YORK, WOODWARD & LOTHROP, INCORPORATED, AND CHAS. H. TOMPKINS COMPANY.

January 15, 1973.

Record Nos. 7877 and 7878.

Present, All the Justices.

*Thomas H. McGrail*, for appellant in Record No. 7877.

*Wilbur L. Hazlegrove (Hazlegrove, Carr, Dickinson, Smith & Rea,* on brief), for appellee in Record No. 7877.

*Wilbur L. Hazlegrove (Hazlegrove, Carr, Dickinson, Smith & Rea,* on brief), for appellant in Record No. 7878.

*Thomas H. McGrail*, for appellee in Record No. 7878.

COCHRAN, J., delivered the opinion of the court.

The final order entered June 2, 1971, from which these appeals were granted, denied relief to The First National Exchange Bank of Virginia (Bank) on its bill to enforce a mechanic's lien under Code § 43-1 *et seq.* (Record No. 7878), and denied relief to The Fidelity and Casualty Company of New York (Fidelity) on its cross-bill to recover certain monies received by the Bank (Record No. 7877).

The controversy, arising from the financial collapse of Virginia Prestressed Concrete Corporation (Prestressed) and its wholly owned subsidiary, Atlas Erectors, Incorporated (Atlas), was submitted to the trial court under a stipulation that comprised narrative statements of facts and voluminous exhibits.

Woodward & Lothrop, Incorporated, owner, entered into a contract dated November 2, 1964, with Chas. H. Tompkins Company (Tompkins), contractor, for construction of a warehouse building in Fairfax County. By a subcontract entered into November 23, 1964, between Tompkins and Prestressed, it was agreed that Prestressed would "furnish all labor, material, equipment and plant and services necessary to complete in place the 'Precast and Precast-Prestressed Concrete Building Frame'" specified in the prime contract, for the sum of $761,279.00. By amendment to the subcontract, also dated November 23, 1964, it was provided that obligations imposed upon Prestressed under the prime contract would not arise until execution of the prime contract. The amendment, proposed and prepared by Prestressed, also modified the terms of payment by leaving $94,975.00 for erection work subject to a 10% retainage on progress payments, but making $666,304.00 for materials fabricated and supplied on the job site subject only to one-half of 1% discount on progress payments. It was stipulated that the main purpose of the

amendment was to avoid retainage on the fabrication portion of the subcontract.

Fidelity issued payment and performance bonds dated November 23, 1964, in the penalty of $666,304.00, naming Prestressed as principal, Fidelity as surety and Tompkins as obligee, for fabrication and supply of materials. It issued payment and performance bonds in the penalty of $94,975.00 on the same date, with Atlas as principal, Fidelity as surety and Tompkins as obligee, covering erection of materials on the job site. Fidelity required Prestressed and Atlas to execute indemnity agreements assigning their rights under the subcontract, conditioned upon default.[1]

By subcontract dated December 30, 1964, Prestressed sub-subcontracted to John Howard Steel Erectors, Inc. (Howard) the bulk of the erection work, with a few exclusions, for $89,000.00. Prior to June, 1965, Howard became financially distressed and Prestressed, by agreement dated June 10, 1965, re-subcontracted the work undertaken by Howard to Neal Lawrence, Inc. on a cost plus percentage basis. By subcontract dated June 10, 1965, Prestressed sub-subcontracted to Tonstad Caulking Company the caulking of wall panels at the job site for $5,390.00. Also in June, 1965, following a request by Fidelity to examine all subcontract assignments, Prestressed and Atlas, without advising Fidelity, executed a subcontract dated back to December 30, 1964, under which Prestressed purported to sub-subcontract to Atlas the entire hauling of materials and erection thereof on the job site for $94,975.00. Nevertheless, except for some minor tasks, Atlas actually performed no erection or caulking work on the project.

Prestressed's employee, DuPuy, serving as project manager, was responsible for delivery of materials and proper erection thereof on the job site. Prestressed, with the knowledge of Tompkins, entered

---

[1] The applications for bonds executed by Prestressed and Atlas provided in pertinent part as follows:

"*Fourth*, to assign, transfer and set over, and does or do hereby assign, transfer and set over to the Company, as collateral, to secure the obligations herein and any other indebtedness and liabilities of the undersigned to the Company, whether heretofore or hereafter incurred, *such assignment to become effective as of date of said contract bond but only in event of* (1) any abandonment, forfeiture or breach of said contract or of any breach of said bond or bonds, or any of them, or of any other bond or bonds executed or procured by the Company on behalf of the undersigned; or (2) of any breach of the agreements herein contained; or (3) of a default in discharging such other indebtedness or liabilities when due; . . . (b) All the rights of the undersigned in, and growing in any manner out of, said contract . . . (d) any and all percentages retained on account of said contract, and any and all sums that may be due under said contract at the time of such abandonment, forfeiture or breach, or that thereafter may become due; . . . ." (Emphasis supplied.)

into agreements with several other companies for production of a substantial portion of the concrete materials which it was required to supply under its subcontract with Tompkins.

For many years the Bank had financed Prestressed. Several loans were secured by deeds of trust on Prestressed's real estate, plant and equipment. Since 1958 the Bank had also made operating loans to Prestressed for the performance of contracts made by Prestressed with others. These loans were secured by assignments of the respective contracts to the Bank without notice to third parties. Between January 11, 1965, and June 3, 1965, the Bank advanced to Prestressed the aggregate sum of $395,000.00, evidenced by 16 promissory notes, to finance the Tompkins-Prestressed subcontract. For each advance Prestressed executed its note and an assignment to the Bank of the entire amount of the subcontract proceeds in the sum of $761,279.00.

The last progress payment under the subcontract was made by Tompkins to Prestressed by check dated June 10, 1965, in the sum of $206,525.12. It was received by the Bank on Saturday, June 12, 1965, without notice to Fidelity, with which the Bank had been conferring about the financial problems of Prestressed. The Bank applied $108,610.28 to Prestressed's notes arising from the Tompkins-Prestressed subcontract, leaving a balance of $64,781.21 payable to the Bank, and deposited the remainder to Prestressed's account. The Bank required Prestressed to pay out of the deposit the aggregate amount of $86,330.80 to two suppliers.

On June 18, 1965, all work at the job site under the Tompkins-Prestressed subcontract was suspended. A few days later Prestressed and Atlas filed voluntary petitions in bankruptcy.

The Bank cooperated with Tompkins to effect completion of performance of the Prestressed subcontract. The Bank assisted in having Prestressed's plant leased to Southern Block and Pipe Company and in causing finished materials to be released for delivery on the job site. It advanced money for a week's payroll, for which it was subsequently reimbursed in the Prestressed bankruptcy proceedings. Erection of materials was completed by other companies on order of Tompkins. Upon completion of the job there remained in Tompkins's hands a balance of $84,658.14 of the Tompkins-Prestressed subcontract proceeds.

On September 7, 1965, the Bank, as assignee of Prestressed and in its own right, filed a mechanic's lien to secure its claim to these proceeds, but Tompkins paid the money to Fidelity as surety for Prestressed. Fidelity paid numerous mechanics' liens filed against Pre-

stressed in the aggregate amount of $88,360.68, and one filed against Atlas in the amount of $14,595.38. Only the claim against Atlas was litigated to judgment. In addition two other non-lienor claimants against Prestressed were paid by Fidelity.

The Bank commenced a suit to enforce its lien on March 4, 1966, seeking $84,602.02 of the subcontract balance allocated to fabrication and materials, as security for payment of Prestressed's indebtedness of $64,781.21, plus per diem interest of $10.80 from August 10, 1965, and attorney fees of $9,717.18. The owner, Tompkins and Fidelity, named as defendants, filed a demurrer challenging the Bank's right to claim a mechanic's lien either as assignee or in its own right. This demurrer was overruled by the trial court. Defendants also filed an answer that asserted as a Sixth Defense that the Bank's claim to sub-contract proceeds was subject to setoff for "amounts paid to or owed to persons who furnished labor, material and services under said subcontract." The Bank's motion to dismiss the Sixth Defense, on the grounds that Fidelity was only a "nominal" party not entitled to assert an affirmative defense, and that Fidelity was also not en-titled to set off claims paid without adjudication of their validity, was overruled by the trial court.

Fidelity filed a cross-bill against the Bank seeking to recover the progress payment of $206,525.12 received by the Bank on June 12, 1965, when, Fidelity alleged, Prestressed already was in default. The Bank's demurrer, assigning as grounds therefor, among others, that the claim could not be maintained in a suit to enforce a mechanic's lien, was overruled.

■ Assuming, without deciding, that it could assert a mechanic's lien under the facts of this case, we nevertheless conclude that the Bank may not recover on its bill.

The Bank's claim to any portion of the balance of the proceeds depends upon the severability of the Tompkins-Prestressed sub-contract. The Bank argues that Prestressed was a fabricator-material-man, and not a subcontractor, and that those who supplied materials to Prestressed were not protected by the mechanics' lien statutes. Although the subcontract did not refer to Atlas, the Bank contends that the subcontract contemplated performance by Prestressed only as a fabricator-materialman and by Atlas as a subcontractor for erec-tion.

The Bank relies on the facts that Atlas, but not Prestressed, was registered and licensed as a subcontractor under the provisions of Code § 54-128 and that the amendment to the subcontract changed

the terms of payment to reflect fabrication and erection phases. It also relies on the execution by Fidelity of payment and performance bonds for Prestressed for the fabrication phase and for Atlas for the erection work, and on the reference to Prestressed and Atlas as "subordinate contractors" in an agreement executed by Fidelity in March, 1966, under which Fidelity indemnified Tompkins and the owner against claims that might arise from payment by Tompkins to Fidelity of the balance of subcontract proceeds.

We will assume that Prestressed, having executed the Tompkins subcontract with the amendment thereto changing the terms of payment, was prepared to have the subcontract performed by those legally qualified to do so rather than risk forfeiture of all contract proceeds under principles set forth in *F. S. Bowen Elec. Co., Inc.* v. *Foley*, 194 Va. 92, 100-01, 72 S.E.2d 388, 393-94 (1952). Nevertheless, the subcontract was executed as a unit, notwithstanding the issuance of bonds premised on severability of performance, and we cannot agree with the Bank that it was severable for all purposes.

Tompkins contracted with Prestressed rather than partly with Prestressed and partly with its wholly-owned and financially dependent subsidiary, Atlas. There was no privity of contract between Tompkins and Atlas. Moreover, Atlas performed only negligible work at the job site. With the exception previously referred to, sub-subcontractors dealt only with Prestressed, not Atlas, they billed only Prestressed for payment, and they filed mechanics' liens against Prestressed and not against Atlas. All invoices under the Tompkins-Prestressed subcontract were submitted in the name of Prestressed and were paid to Prestressed. Indeed, the Bank itself accepted assignment from Prestressed alone of the entire proceeds of the subcontract. Accordingly, we conclude that, at least as to sub-subcontractors asserting mechanics' liens[2] against Prestressed, the Tompkins-Prestressed sub-

---

[2] "Code § 43-1. "Terms general contractor" and "subcontractor defined."—As used in this chapter, the term *"general contractor"* shall include contractors, laborers, mechanics, and persons furnishing materials, who contract directly with the owner and the term *"subcontractor"* shall include all such contractors, laborers, mechanics, and persons furnishing materials, who do not contract with the owner but with the general contractor."

"Code § 43-9. Perfection of lien by person performing labor or furnishing materials for a subcontractor; extent of lien.—Any person performing labor or furnishing materials for a subcontractor, in order to perfect the lien given him by § 43-3, shall comply with the provisions of § 43-4, and in addition thereto give notice in writing to the owner of the property, or his agent, and to the general contractor, or his agent, of the amount and character of his claim. But the amount for which a lien may be perfected by such person shall not exceed the amount for which such subcontractor could himself claim a lien under § 43-7." (1953 Repl. Vol.)

contract was not severable, and all persons performing labor or supplying materials under contracts with Prestressed were entitled to the protection of the mechanics' lien statutes.

The Bank next contends that even if Fidelity is entitled to set-off or recoupment for liens paid, only $73,988.71, attributable to fabrication and materials, of the $88,360.68 in lien claims filed against Prestressed and paid by Fidelity could properly be chargeable to Prestressed. But, as the validity of this argument depends also upon severability of the subcontract as to sub-subcontractors, we reject it. Therefore, if Fidelity acted within its rights in paying the lien claims of $88,360.68, the trial court correctly held that the Bank could not successfully assert a mechanic's lien because the balance of subcontract proceeds of $84,658.14 was not unconditionally owed to Prestressed when the Bank's lien was filed.

The prime contract required Tompkins to construct the warehouse "free and clear of and from all claims, liens, and charges of any kind." The Tompkins-Prestressed subcontract incorporated the provisions of the prime contract and required Prestressed to assume the obligations of Tompkins thereunder applicable to the subcontract. The Bank contends that, notwithstanding these requirements, Tompkins had no obligation or right to pay those supplying labor or materials to Prestressed. We disagree. We conclude that the trial court correctly held that Tompkins was contractually obligated to pay Prestressed's suppliers and laborers and that Fidelity assumed this obligation under its bond. *See National Bank & Trust Co.* v. *Castle*, 196 Va. 686, 694-95, 85 S.E.2d 228, 233 (1955); *Framingham Trust Co.* v. *Gould-National Batteries, Inc.*, 427 F.2d 856 (1st Cir. 1970).

In the application for the payment bond Prestressed authorized Fidelity to "adjust, settle or compromise any claim, demand, suit or judgment upon said bond ... unless [Prestressed] shall request the Company to litigate such claim or demand ..." and shall deposit "at the time of such request, cash or collateral...." Fidelity's liability on the bond extended to payment of "all just claims ... for labor performed and for materials [etc.] ... furnished at the request of [Prestressed] ..." and to payment of "all persons who have contracts directly with [Prestressed] for labor or materials...." Therefore, Fidelity had contractual authority to pay mechanics' liens and other claims against Prestressed and, as the trial court ruled, it did not have to require an adjudication of validity or convene the Bank to contest the claims before paying them. So long as Fidelity did not act in

bad faith, and the trial court found no evidence of bad faith, it could avoid the additional expense incident to the reduction of each claim to judgment.

The Bank, claiming as assignee of the subcontract proceeds, can have no greater rights than its assignor. *National Bank & Trust Co. v. Castle, supra.* As Prestressed could not have prevailed over mechanics' lien claims of sub-subcontractors the Bank cannot prevail. Fidelity, having paid lien claimants, is subrogated to their claims against the proceeds. Hence, Fidelity's claim is superior to that of the Bank. *See* 4 A. Corbin, *Contracts* § 901, at 610 (1951) [hereinafter cited as Corbin].

We find no merit in the Bank's contention that the trial court erred in permitting Fidelity to plead setoff or recoupment as a defense and to file a cross-bill in the mechanic's lien suit. In a chancery cause the court has broad power to proceed to a complete adjudication of all rights asserted by the parties in order to avoid a multiplicity of suits and to terminate litigation. *Iron City Sav. Bank* v. *Isaacsen,* 158 Va. 609, 164 S.E. 520 (1932). We find no abuse of discretion by the chancellor.

Fidelity has assigned error to the ruling of the trial court denying relief to Fidelity on its cross-bill. The trial court held that Fidelity's claim to the $206,525.12 progress payment received by the Bank as assignee on June 12, 1965, depended on whether Prestressed was at that time in default under its subcontract. With the burden on Fidelity to show that the payment was received after default, the chancellor was unable to determine that Prestressed had defaulted by the payment date.

Counsel for Fidelity conceded in oral argument that the dispositive question is whether Prestressed was in default on June 12, 1965, and the Bank had knowledge of the default. *See Aetna Casualty & Surety Co.* v. *Harvard Trust Co.,* 344 Mass. 160, 181 N.E.2d 673 (1962); Corbin § 875. Fidelity maintains, however, that the stipulated facts show, as a matter of law, that the Bank knew that Prestressed was in default on that date. We do not agree.

On June 12, 1965, Prestressed was still operating as a going concern. It did not suspend operations under the subcontract until June 18. Prestressed, with the Bank's knowledge, was in financial distress. But the Tompkins-Prestressed subcontract did not specify acts constituting a default thereunder. There were, as the trial court observed, unpaid bills as of June 12, 1965, and it seems clear that Prestressed had recently sustained serious financial reverses on another

contract. These facts, however, do not of themselves establish default on this subcontract on the payment date. The trial court could properly conclude that Fidelity had failed to carry its burden of proving that Prestressed was in default. As this is a factual determination reasonably supported by the evidence, we will not disturb it. *Hoback* v. *Hoback*, 208 Va. 432, 435, 158 S.E.2d 113, 116 (1967).

*Affirmed.*